OPINION OF THE COURT
Edward H. Lehner, J.
On the motion before me by defendants to dismiss the complaint pursuant to CPLR 3211 (a) (7), the two key issues presented are whether the failure of the legislature to provide for a pay adjustment to state-paid judges for a nine-year period violates (i) the provision of the State Constitution prohibiting diminishment of judicial compensation, and (ii) the separation of powers doctrine.
The Complaint
The plaintiffs herein are two judges of the Family Court, a judge of the Civil Court of the City of New York and a judge of the Criminal Court of the City of New York, all of whom allege that they have not received an increase in compensation since 1999. They assert that the failure to adjust judges’ compensation “to offset the effects of inflation and increased cost of living ... is unconstitutional” in violation of section 25 (a) of article VI of the New York Constitution (complaint HI! 15, 16), which provides that the compensation of a judge “shall not be diminished during the term of office for which he or she was elected or appointed” (the no-diminution clause). They further allege that “linking judicial compensation to legislative compensation, . . . results in the judiciary not being treated as a co-equal branch of government,” and is thus a breach of the doctrine of separation of powers {id. H 28).
As relief, plaintiffs seek a judgment (i) declaring that defendants’ failure to adjust plaintiffs’ compensation is violative of the no-diminution clause and the separation of powers doctrine, and (ii) ordering defendants to provide plaintiffs with cost of living adjustments commencing in January 2000, with interest. The request to impound the $69.5 million allocated for- salary increases in the 2006-2007 budget has been withdrawn (tr at 8).
*228 While the complaint does seek the payment of money, at oral argument plaintiffs’ counsel acknowledged that the court could not direct members of the legislature to vote for an increase (tr at 18, 57-58). Accordingly, the relief sought by plaintiffs was, in essence, amended to only seek a declaration that the failure to increase compensation is unconstitutional. Counsel opined that the “persuasive power of the court [should cause the legislature] to remedy that” (tr at 17-18), and that it is expected that the Governor “would read your opinion and understand anew what his obligations are and thereby be motivated to do the right thing” (tr at 59).[1] In this connection, it has been stated that the
“primary purpose of declaratory judgments is to adjudicate the parties’ rights . . . [and that] [t]he action . . . contemplates that the parties will voluntarily comply with the court’s order . . .
“Thus, the ultimate availability of a coercive order to enforce adjudicated rights is not a prerequisite to a court’s entertaining an action for declaratory judgment” (Klostermann v Cuomo, 61 NY2d 525, 538-539 [1984]).
Recusal
While the named plaintiffs in this action do not include any justices of the Supreme Court, it was recognized that the issues raised herein pertain to all state-paid judges and justices of the Unified Court System (hereinafter jointly referred to as judges), and that therefore under the “doctrine of necessity” (see United States v Will, 449 US 200 [1980]; Williams v United States, 240 F3d 1019, 1025-1026 [DC Cir 2001]), it was appropriate for me to preside in this case assigned under the random assignment system in effect in this court (tr at 2).
Venue
The application made at oral argument to. transfer this action to Albany County based on the convenience of witnesses and because a similar action is pending there (see Maron v Silver, NYLJ, Dec. 6, 2007, at 29, col 1) was denied by me on the *229 grounds that: (i) no affidavit was submitted indicating that any potential necessary witness would be inconvenienced (see Gissen v Boy Scouts of Am., 26 AD3d 289 [1st Dept 2006]); (ii) the issues discussed by the two state employees referred to by defendants who had submitted affidavits in the Albany County suit were not relevant to this action;[2] and (iii) since venue was admittedly properly laid in New York County and the issues raised were somewhat different from the Marón action,[3] the plaintiffs were entitled to have their action heard here (tr at 3-12).
Facts
There has been no adjustment in the salary paid to judges since the increase enacted in 1998 (L 1998, ch 630 [eff Jan. 1, 1999]). On April 30, 2007, the Senate passed a bill (S5313) increasing the salary of justices of the Supreme Court to $165,200, retroactive to January 1, 2007, with other judges to receive a salary adjustment at a higher or lower percentage of said sum depending on the court to which he or she was elected or appointed. The bill, which also provided for the establishment of a commission to quadrennially recommend salary adjustments for the judiciary as well as for members of the legislature and the executive, was cosponsored by every member of the Senate and had a companion measure in the Assembly (A7913) sponsored by Speaker Sheldon Silver. However, when the Governor interposed his objection to any increase in the salary of legislators without favorable action on bills he favored, such as campaign finance reform (which the Senate Majority reportedly opposed), the Senate Democrats withdrew their support for the bill and the Assembly never took any action on the measure in view of a veto threat from Governor Spitzer. On December 13, 2007, the Senate passed a bill (S6550), almost *230 unanimously, that provided for increases for the judiciary similar to that provided in S5313, but provided no means for increases for members of the legislature or the executive. The Assembly did not reconvene in December and hence no action was taken by it on the issue, but it has been repeatedly reported that the Assembly will not pass a bill providing for a judicial pay adjustment that does not also include a legislative salary increase.[4]
At oral argument, the Assistant Attorney General acknowledged that each of his clients (the Senate, the Assembly and the Governor) has indicated support for an increase in judicial compensation, and has also agreed as to the amount (tr at 20-21, 34-35). In fact, the New York Law Journal on the day of oral argument (Jan. 10, 2008) quoted Governor Spitzer’s spokeswoman as reiterating that “the governor remains committed to the judicial pay raise” (Joel Stashenko, Spitzer Ignores Court Issues in State of the State Message, NYLJ, Jan. 10, 2008, at 1, col 4), and he made the following statement when submitting the judiciary budget to the legislature:
“Judicial salaries have remained unchanged since 1999, and establishing new compensation levels for judges is a high priority of the Chief Judge. In recognition of the importance of this issue, which has languished too long, and in support of the Chief Judge, the Executive Budget includes Article VII legislation to provide for a judicial salary increase.
“The Article VII legislation I am submitting includes a judicial pay increase [$165,200] retroactive to April 1, 2006, at the same level recommended by the Chief Judge. In addition, my bill would increase salaries another 2.5 percent on April 1, 2008, in recognition that judicial salaries at the Federal level were raised by that amount on January 1, 2008. I strongly urge the Legislature to take action on this proposal.” (Commentary of the Governor on the Judiciary, in Executive Budget Agency Presentations, Part III, at 535, available at http:// publications.budget. state.ny.us/eBudget0809/ *231 agencyPresentations/pdf/AgencyPresentations.pdf [accessed Feb. 25, 2008].)
However, while they have publicly stated their support for the proposed increase, defendants oppose the requested declaration on the grounds that any adjustment in compensation can only occur through the legislative process.
Separation of Powers
The essence of plaintiffs’ argument on the separation issue is that while all defendants agree that a pay adjustment to the judiciary due to inflation over the last nine years is warranted, the fact that no law has been passed is due to the attempted linkage of judicial and legislative pay adjustments and, in 2007, to the political infighting between the Governor and the Senate over a measure (campaign finance reform) which has absolutely no relevance to the judicial compensation issue.
While several state constitutions expressly mandate a separation of powers,[5] in New York “this principle ... is included by implication in the pattern of government adopted by the State” (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 355-356 [1985]). In Pataki v New York State Assembly (4 NY3d 75, 100 [2004, Rosenblatt, J., concurring]), Judge Rosenblatt noted that the separation concept goes back to our first State Constitution in 1777, which was written a decade prior to the United States Constitution. In Federalist No. 47, James Madison wrote, in response to opponents of adoption of the Constitution who had argued that the document did not adequately provide for the separation of powers, that:
“[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. ... In order to form correct ideas on this important subject, it will be proper to investigate the sense in which the preservation of liberty requires that the three great departments of power should be separate and distinct.”
In Federalist No. 78, Alexander Hamilton observed that the “judiciary . . . has no influence over either the sword or the purse” and is by “comparison the weakest of the three departments,” but “there is no liberty, if the power of judging be not separated from the legislative and executive powers.”
*232 The following, written by Judge Vann over a century ago in People ex rel. Burby v Howland (155 NY 270, 282 [1898]), vividly sets forth the necessity for continued vigilance in preserving our tripartite system of government:
“The object of a written Constitution is to regulate, define and limit the powers of government by assigning to the executive, legislative and judicial branches distinct and independent powers. The safety of free government rests upon the independence of each branch and the even balance of power between the three. Unite any two of them and they will absorb the third with absolute power as a result. Weaken any one of them by making it unduly dependent upon another and a tendency toward the same evil follows. It is not merely for convenience in the transaction of business that they are kept separate by the Constitution, but for the preservation of liberty itself, which is ended by the union of the three functions in one man, or in one body of men. It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others.
“Nothing is more essential to free government than the independence of its judges, for the property and the life of every citizen may become subject to their control and may need the protection of their power. Not a contract is made except in reliance upon their ability to afford redress if it is violated. Men part with property upon the promise of their fellows, walk the streets by day and sleep in peace at night in the confidence that the silent and unseen power of the judiciary is always ready to protect their rights. Any legislation that hampers judicial action or interferes with the discharge of judicial functions is in conflict with the principles of the Constitution.”
It has been said “that a foundation of free government is imperiled when any one of the coordinate branches absorbs or interferes with another” (Matter of County of Oneida v Berle, 49 NY2d 515, 522 [1980]), and that “one of the plain purposes of the separation of powers theory is to guard against one Branch seeking to maximize power” (Cohen v State of New York, 94 NY2d 1, 13 [1999]). However, the courts have recognized that “the manner by which the State addresses complex societal and *233 governmental issues is a subject left to the discretion of the political branches of government” (Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 240 [1984]) as “the Judiciary has a duty to defer to the Legislature in matters of policymaking” (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14, 28 [2006] [internal quotation marks omitted]), and “it is not the province of the courts to direct the legislature how to do its work” (New York Pub. Interest Research Group v Steingut, 40 NY2d 250, 257 [1976]; see also Urban Justice Ctr. v Pataki, 38 AD3d 20, 27 [1st Dept 2006]).
Coming to the facts herein, it appears that the failure of the legislature to provide the judiciary with the undisputed compensation adjustment comes down in the end to the fact that the Governor and the Senate are embroiled in a political dispute as to the proper means of reforming the State’s laws with respect to campaign financing. This issue is apparently vital to certain members of the legislature as it has been contended that the Governor’s proposal would unfairly affect the ability of some members to finance effective campaigns. However, the controversy in no way affects the judiciary, which has been caught in the crossfire between the executive and the legislature, and which has no seat at the bargaining table to in any manner affect or resolve that controversy. While clearly the legislative process involves tradeoffs and compromises on a myriad of political issues, to continue to deprive the third, supposedly coequal, branch of government with a pay adjustment, on which there is no policy dispute, for nearly a decade does raise an issue as to whether the two other branches have abused their power, and thus unconstitutionally interfered with the independence of the judiciary.
While it is evident that the lawyers who serve in the judiciary generally recognized when they chose their public service careers that they would not receive compensation equivalent to attorneys engaged in private practice, the comparable situation has deteriorated so in the last nine years that a 24 year old, just graduated from law school and a first-year associate in a large New York City firm, would, if named Chief Judge of the Court of Appeals (assuming that were legally permissible), now have to take a substantial pay cut to accept that highest position in our state court system.
In his concurring opinion in the recent decision in New York State Board of Elections v Lopez-Torres (552 US —, —, 128 S Ct *234 791, 803 [2008]), relating to the State’s judicial convention system, Justice Kennedy wrote that the “rule of law, which is a foundation of freedom, presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute probity of its judges,” and that “it is unfair to them and to the concept of judicial independence if the State is indifferent to a selection process open to manipulation, criticism, and serious abuse.” The same, as to unfairness, could be said about the indifference of the State as to the compensation it pays its judges.
Although defendants acknowledge that the inactivity on the compensation issue has resulted in a demoralization of the judicial branch of government (tr at 67), they argue that the failure of plaintiffs to “identify any impairment in the functioning of the judiciary . . . has to be viewed ás a terminal deficiency in a separation of powers case.” In this regard they argue that plaintiffs do not allege that judges “are now less fair, competent, hard working, dedicated and independent by reason of their long wait for a raise — but the plaintiffs cannot be indulged in such reticence if they wish to have this court accept that the Judiciary has been truly affected to an extent of constitutional dimension.”[6] At oral argument, the Assistant Attorney General maintained, referring to the foregoing position, that although “it would be distasteful to make that kind of an allegation, . . . something like that is necessary to show an impairment of the independence of the judicial branch” (tr at 37).
I find that no such allegations are necessary, and that the proof, with respect to the work ethic of judges, almost surely would not establish the above deficiencies which defendants assert are necessary to sustain the separation of powers cause of action. While some judges have recused themselves in cases when legislators or their firms have appeared, there is no evidence that, although admittedly demoralized, the judiciary has not continued to function as in the past. Judges do not have to violate their oath of office, by which they commit themselves to perform their duties “to the best of their ability,” in order to be able to establish that the defendants have violated the Constitution.
While it has been observed that “[t]he concept of separation of powers is not one that is capable of precise legal definition *235 and it does not yield clear solutions to intragovernmental disputes,”[7] I find that the allegations of the complaint, giving the “plaintiffs the benefit of every possible favorable inference” (Leon v Martinez, 84 NY2d 83, 87 [1994]), set forth sufficient, facts to warrant denial of defendants’ application to dismiss the second cause of action asserting a violation of the separation of powers doctrine.
The No-Diminution Clause
With respect to the claim asserted in the first cause of action that the effect of inflation over the past nine years has resulted in a violation of the no-diminution clause,[8] plaintiffs have acknowledged that no New York case has ruled on that issue (tr at 69) although inflation has been a continuing phenomenon through the years. Further, plaintiffs do not argue that a specified amount of compensation provided by statute as fixed by the legislature can be so low as to constitute a constitutional violation. Rather, the contention herein is that it is the failure to provide cost of living adjustments to the salary so fixed that impinges on the constitutional protection provided to judges (tr at 29). It is noted that judges are the only state officials protected against a salary reduction.
In Evans v Gore (253 US 245 [1920]), it was held that the imposition of an income tax, after adoption of the Sixteenth Amendment to the United States Constitution, on the salary of a federal judge appointed prior to its adoption was unconstitutional as it would be violative of section 1 of article III of the United States Constitution, which provides (similar to the no-diminution clause of the New York State Constitution) that salaries of federal judges “shall not be diminished during their Continuance in Office” (the Compensation Clause). In United States v Will (supra), the court stated that a purpose of the Compensation Clause, in addition to “promoting judicial independence,” was to ensure “a prospective judge that, in abandoning private practice — more often than not more lucrative than the bench — the compensation of the new post will not diminish[, and] . . . such assurance has served to attract able lawyers *236 to the bench and thereby enhances the quality of justice” (449 US at 221).
However, in United States v Hatter (532 US 557 [2001]), the ruling in Evans was specifically overruled “insofar as it holds that the Compensation Clause forbids Congress to apply a generally applicable, nondiscriminatory tax to the salaries of federal judges, whether or not they were appointed before enactment of the tax” (at 567). There, Justice Breyer, writing for the court (at 570), cited with approval the dissenting opinion in Evans of Justice Holmes, joined in by Justice Brandéis, where he wrote:
“The exemption of salaries from diminution is intended to secure the independence of the judges, on the ground, as it was put by Hamilton in the Federalist (No. 79) that ‘a power over a man’s subsistence amounts to a power over his will.’ That is a very good reason for preventing attempts to deal with a judge’s salary as such, but seems to me no reason for exonerating him from the ordinary duties of a citizen, which he shares with all others. To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge. I see nothing in the purpose of this clause of the Constitution to indicate that the judges were to be a privileged class, free from bearing their share of the cost of the institutions upon which their well-being if not their life depends.” {Evans, 253 US at 265 [Holmes, J., dissenting].)
In Hatter, the court distinguished between a direct and an indirect nondiscriminatory reduction in compensation, stating that while
“the Legislature cannot directly reduce judicial salaries even as part of an equitable effort to reduce all Government salaries [,] ... a tax law . . . affects compensation indirectly . . . [and thus] the potential threats to judicial independence that underlie the Constitution’s compensation guarantee cannot justify a special judicial exemption from a commonly shared tax” (532 US at 571).
Thus, the Medicare tax involved in that case, which was imposed on all salaried taxpayers, was held not to violate the Compensation Clause, whereas the effect of the complicated changes in the Social Security tax amendment was found to have had a discriminatory impact on federal judges and thus constituted a *237 constitutional violation. Although the effects of inflation were not an issue in the case, in his dissent Justice Scalia commented that the following, stated by Hamilton in Federalist No. 79, indicated bis belief “that inflation does not diminish compensation as that term is used in the Constitution” (532 US at 584):
“It will readily be understood that the fluctuations in the value of money and in the state of society rendered a fixed rate of compensation in the Constitution inadmissible. What might be extravagant today, might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances, yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the worse.” (Hamilton, Federalist No. 79.)
Since clearly the impact of inflation affects all, the decrease in the economic value of the salaries paid to judges over the past nine years has not had a particularized discriminatory impact on judges different from that upon any other person who did not receive a salary increase during that period, and, thus, under the principles set forth in Hatter, it is declared that allegations that assert only a failure to increase salaries for nine years do not state a viable claim for a violation of the no-diminution clause.[9] Accordingly, the branch of defendants’ motion to dismiss the first cause of action is granted.
The Speech or Debate Clause
Governor Eliot Spitzer has argued that the action should be dismissed as against him on the grounds that he is immune from suit based on article III, § 11 of the New York Constitution which provides that “[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place.” Although, of course, the Governor is not a member of the legislature, the United States Supreme Court has ruled that there is a common-law immunity applicable to state and local legislators, similar to that provided to members of Congress under the United States Constitution (art I, § 6), that also grants immunity to members of the executive branch “when they perform legislative functions” (Bogan v Scott-Harris, 523 *238 US 44, 55 [1998]). In Bogan, it was held that a mayor’s “introduction of a budget and signing into law an ordinance . . . were formally legislative, even though he was an executive official . . . because they were integral steps in the legislative process.” (Id.)
In Supreme Court of Va. v Consumers Union of United States, Inc. (446 US 719 [1980]), the Virginia Supreme Court had adopted, pursuant to statutory authority, rules regulating the conduct of attorneys. The plaintiff, which sought to publish a directory of attorneys listing their education, areas of specialization, billing practices and client relations, encountered difficulties obtaining this information from attorneys who feared the listings would violate the court’s ethical rules on advertising. It then commenced an action against, among others, the court and its chief justice (both individually and in his official capacity) seeking a declaration that they had violated the plaintiffs rights under the First and Fourteenth Amendments to gather and publish information about practicing attorneys, and sought a permanent injunction against enforcement of the rules. The U.S. Supreme Court concurred with the opinion of a dissenting judge in the court below that “in enacting disciplinary rules, the Supreme Court of Virginia is constituted a legislature” (at 731) and, agreeing that “legislative immunity . . . bars an action for declaratory and injunctive relief just as it bars an action for damages” (at 732 n 10), ruled that if “the sole basis for [the] action against the Virginia Court and its chief justice were the issuance of, or failure to amend, the challenged rules, legislative immunity would foreclose suit” against said defendants (at 734). However, because Virginia law gave the court “independent authority of its own to initiate proceedings against attorneys,” the U.S. Supreme Court ruled that “the Virginia Court and its members were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies were” (at 736).
In the recent case of State Empls. Bargaining Agent Coalition v Rowland (494 F3d 71 [2d Cir 2007]), where plaintiffs alleged that their employment was unlawfully terminated by the Governor and other executive officials of the State of Connecticut, it was held that legislative immunity “may bar not only claims for damages, but also certain claims seeking injunctive relief against state officials in their official capacities” (at 76). However, the court granted discovery on the grounds that “before the defendants can cloak their actions with immunity, *239 they must make out a good faith claim to it, that is, they must show that they ordered the layoffs to achieve budgetary savings . . . and not for other reasons” (at 81; see also Campaign for Fiscal Equity v State of New York, 179 Misc 2d 907, 911 [Sup Ct, NY County 1999], affd 265 AD2d 277 [1st Dept 1999]).
Here, the relief sought, as amended at oral argument (supra), seeks no remedy against the Governor in that the relief plaintiffs request has been limited to a declaration that the failure to enact an adjustment in compensation for the judiciary is unconstitutional. There is no dispute that the remaining defendants (the State of New York, the Senate and the Assembly) are proper parties, and counsel on both sides agreed that a dismissal of the action as against the Governor would not be a bar to the declaratory relief sought (tr at 55-59).
Further, if plaintiffs had continued to seek relief against the Governor in the manner prayed for in the complaint, it apparently would be to require him to sign a legislative enactment increasing judicial compensation. This would clearly be a “legislative function” as referred to in Bogan v Scott-Harris (supra) and warrant dismissal on immunity grounds.
Accordingly, the Governor is entitled to dismissal of the action as against him.
Conclusion
The motion of Governor Eliot Spitzer to dismiss the action as against him is granted and the Clerk shall enter judgment accordingly, without costs, severing the action as against the remaining defendants. The motion of the remaining defendants to dismiss the complaint is granted as to the first cause of action and denied as to the second cause of action.

. Chief Judge Judith Kaye has for several years pleaded with the defendants to enact an increase and has stated that she would consider, as a last resort, commencing litigation on behalf of the judiciary to seek the type of increase sought herein. (See Joel Stashenko and Daniel Wise, Nussbaum Tapped by Kaye to Prepare Judicial Pay Suit, NYU, Jan. 28, 2008, at 1, col 4; Judith S. Kaye, State of the Judiciary ? Pay Crisis Is Taking Its Toll, NYLJ, Jan. 28, 2008, at 11, col 1).

. One of the affiants set forth facts with respect to the health insurance benefits provided to the judiciary. Although the issue of increases in the cost of health benefits has not been raised in this action (tr at 7-8), defendants acknowledged that “benefits including retirement are . . . part of [judges’] total employee compensation” (defendants’ reply mem of law at 10), and that any increase in the cost of such benefits would be an unconstitutional reduction in compensation if it were not for the fact that any increases have been of a “de minimis” nature (tr at 51-52).

. In the Marón case, factual issues remaining are whether “the failure to provide salary increases [was] designed to influence the Judiciary,” and whether such failure was “due, in part, to displeasure with certain court decisions” (Marón v Silver, NYLJ, Dec. 6, 2007, at 29, col 1), issues not asserted herein.

. E.g. Joel Stashenko and Daniel Wise, Nussbaum Tapped by Kaye to Prepare Judicial Pay Suit, NYLJ, Jan. 28, 2008, at 1, col 4; Judith S. Kaye, State of the Judiciary ? Pay Crisis Is Taking Its Toll, NYLJ, Jan. 28, 2008, at 11, col 1; Fair Pay for Judges, New York Times, Dec. 18, 2007, section A, at 34; Joel Stashenko, Spitzer’s Budget Again Addresses Judicial Raises, NYLJ, Jan. 23. 2008. at 1. col 3.

. See Harold H. Bruff, Separation of Powers under the Texas Constitution, 68 Tex L Rev 1337 (1990).

. Defendants’ mem of law at 22-24.

. 1 Rotunda and Nowak, Treatise on Constitutional Law: Substance and Procedure § 3.12 (a) (4th ed).

. It is asserted that during this period there has been a 26% rise in the cost of living and that “New York now ranks 48th in the nation in judicial salary when cost of living is factored into the assessment” (plaintiffs’ mem of law at 17).

. It is noted that plaintiffs have not made the allegations asserted in the Marón case referred to in footnote 3.