OPINION OF THE COURT
Edward H. Lehner, J.
The principal issue before me on plaintiffs’ motion for summary judgment is whether it is unconstitutional under the circumstances herein for defendants to have deprived the judiciary of a salary adjustment for almost a decade due to linkage of the judicial pay issue to measures dealing with legislative compensation and other unrelated substantive matters.
The Prior Motion
The basic facts in this action, commenced by four judges of the Unified Court System, are set forth in my decision dated February 5, 2008 (Larabee v Spitzer, 19 Misc 3d 226 [2008]) (the decision) on the defendants’ pre-answer CPLR 3211 dismissal motion. Therein, I: (i) dismissed the cause of action based on an asserted violation of section 25 (a) of article VI of the New York State Constitution which prohibits any diminishment in the compensation of a judge during his or her term of office; (ii) dismissed the action as against then Governor Eliot Spitzer based on the “speech or debate” clause of article III, § 11 of the NY Constitution; and (iii) denied the application to dismiss the cause of action based on an alleged violation of the separation of powers doctrine.
*868 The Rule of Necessity
While normally recusal ensues when a judge could be financially affected by the outcome of a case, here all parties have recognized that no court, other than the New York State Supreme Court, would have jurisdiction to adjudicate the issues raised herein of violations of state constitutional principles. Thus, it is not disputed that under the well recognized rule of necessity (the rule) it is appropriate for me to preside in this case which was assigned under the random assignment system in effect in this court.
The case of United States v Will (449 US 200 [1980]) involved cost-of-living adjustments that financially affected all federal District Court judges. There, even though no party objected to the case being heard by a federal judge, the United States Supreme Court stated that the “sensitivity of the issues” warranted it considering the issue of disqualification “with the same degree of care and attention we would employ if the Government asserted that the District Court lacked jurisdiction” (at 212). In light of the public discussion of the propriety of this court adjudicating this action, I will do likewise.
In Will, the Court, quoting Frederick Pollock, A First Book of Jurisprudence for Students of the Common Law (at 270 [6th ed 1929]), wrote:
“It was precisely considerations of this kind that gave rise to the Rule of Necessity, a well-settled principle at common law that, as [Pollock] put it, ‘although a judge had better not, if it can be avoided, take part in the decision of a case in which he has any personal interest, yet he not only may but must do so if the case cannot be heard otherwise.’ ” (449 US at 213.)
In reviewing the history of the rule, the Supreme Court noted that it “had its genesis at least five and a half centuries ago” (id.), and “has been consistently applied in this country in both state and federal courts” (id. at 214), the Court citing numerous opinions applying the rule. The Court further noted its prior application of the rule in Evans v Gore (253 US 245 [1920]), which related to the effect of the Sixteenth Amendment, permitting the adoption of an income tax, on the nodiminishment-in-compensation clause of the United States Constitution applicable to federal judges. There it was stated (at 247-248):
“Because of the individual relation of the members *869 of this court to the question, . . . we cannot but regret that its solution falls to us ... . But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation, in which no other judge can have any direct personal interest; and there was no other appellate tribunal to which under the law he could go.”
In Williams v United States (240 F3d 1019 [Fed Cir 2001], cert denied 535 US 911 [2002]), an action by federal District Court judges relating to their cost-of-living increases, the United States Court of Appeals referred to “the centuries-old ‘Rule of Necessity,’ which allows — and even seems to require — federal judges to hear and decide matters in which they have a financial interest, if necessary to the exercise of the court’s jurisdiction,” noting that “where no one else can take his place — it is [the judge’s] duty to hear and decide, however disagreeable it may be” (at 1025-1026). In Maresca v Cuomo (64 NY2d 242 [1984]), which involved a challenge to the mandate of the State Constitution that certain judges retire at the age of 70, the New York Court of Appeals ruled that, although members of that Court “may be affected by the outcome of [the] appeal. . . [, since] no other judicial body exists to which [the] appeal could be referred for disposition, the present members of the court are required to hear and dispose of it under the Rule of Necessity.” (Id. at 247 n 1.)
Finally on this issue, in an exhaustive article setting forth the many cases applying the rule, which was published last year (Kurtis A. Kemper, Construction and Application of Rule of Necessity in Judicial Actions, Providing that a Judge Is Not Disqualified to Try a Case Because of Personal Interest If Case Cannot Be Heard Otherwise, 27 ALR6th 403), the author summarized the applicable principles as follows (at 417-418, §2):
“The Rule of Necessity arises from the proposition that the Rule of Disqualification of judges must yield to the demands of necessity. Thus, according to the Rule of Necessity, the personal interest of a judge in the matter at issue will not result in disqualification if the case cannot be heard otherwise. Stated alternatively, the Rule applies when all judges apparently have an interest in the outcome of a case so that the assignment of a substitute judge is *870 impossible . . .
“Thus, the Rule of Necessity has been applied to permit a judge or court to hear and determine a case where no other judge or forum was available in proceedings involving judges’ salaries or reimbursement for their expenses, pensions or other fringe benefits, and the taxation of judges’ income.”
Since the issues raised in this action relating to the State Constitution cannot be determined in any forum other than our State Supreme Court, it is evident that under the rule I am required to hear and determine the issues presented.
Linkage
It was acknowledged by the Assistant Attorney General at the prior oral argument held on January 10, 2008 that each of his clients had publicly indicated support for an increase in judicial compensation, and had even agreed that the amount of a Supreme Court justice’s salary should be equal to that of a federal District Court judge. At the argument on this motion, defendants’ counsel stated that: “There is a great deal of positive feeling in favor of an increase [in the salary of State Supreme Court justices] to the current salary of federal judges [$169,300] [and] no governor or member of the legislature, to my knowledge, has spoken to the contrary” (tr at 9). However, defendants maintain that any increase can only occur through the normal legislative process.
In 2007, the Senate twice passed bills providing for a judicial pay increase to bring a Supreme Court justice’s salary equal to that of a United States District Court judge. One of the bills (2007 NY Senate Bill S5313 [passed on Apr. 30, 2007]) also provided for the appointment of a commission to recommend adjustments in legislative compensation. The companion bill to that measure (2007 NY Assembly Bill A7913), introduced on April 27, 2007 by Speaker Sheldon Silver, was never passed by the Assembly, apparently based on a threat by Governor Spitzer to veto the measure unless the legislature also adopted his proposal for campaign finance reform (see tr at 10). That reform was not enacted, apparently based on Senate opposition. The second of the said bills (2007 NY Senate Bill S6550) was passed by the Senate, almost unanimously, on December 13, 2007, but contained no provision for a legislative pay adjustment. The Assembly never reconvened in 2007 to act on that measure.
As noted in the decision, it has been widely recognized that the Assembly will not pass a bill providing for a judicial pay *871 adjustment that does not also contain a legislative salary increase, the judicial increase often referred to as being held “hostage.”[1]
On a motion for summary judgment, the court’s initial function is to determine whether there exists a triable issue of fact. Here, plaintiffs allege in their verified complaint the linkage referred to in the footnoted newspaper editorials. Decisive to my determination as to whether any triable issue of fact exists on the claim of linkage is the failure of any member of the legislature or any executive official to submit an affidavit denying the existence of the practice. In light of the lack of a factual dispute, I am required, under the principles applicable to sum *872 mary judgment motions, to conclude (i) that plaintiffs’ claim with respect to the linkage alleged has been established, and (ii) that the agreed adjustment in judicial pay has not been enacted only because there has not been an agreement among the defendants with respect to a legislative pay increase.
The Separation of Powers
It is well understood that the legislative process often involves trade-offs and compromises on a myriad of political issues, many times involving conflicting interest groups. Thus, to achieve enactment of legislation there may be a need to effect agreements among, for instance: upstate and downstate interests; rural and urban constituencies; business and consumer supporters; and landlords and tenants. However, while the Senate and Assembly may perhaps now disagree as to whether it is appropriate for them under the current political situation to enact a legislative pay raise, the legal issue before me comes down to whether the refusal of the legislature for almost a decade to provide the supposedly coequal third branch of government with a pay adjustment due to the aforesaid linkage to legislative pay demonstrates an abuse of power and an unconstitutional interference with the independence of the judiciary. Clearly, a conclusion that the aforesaid practice of linkage may be wrong as a matter of governmental policy does not mandate a finding that it is unconstitutional.
With respect to the operation of the courts, Chief Judge Kaye has indicated that, although the judiciary’s partners in government have failed to take any steps to alleviate the effect of inflation that has devalued judicial salaries by approximately 30% since last adjusted in 1998, the system continues to function well. However, defendants acknowledge that there is a widespread demoralization amongst the judges, who feel deeply let down by this failure of the legislature and the Governor to remedy the erosion of their financial situation. While a few judges have expressed their dismay at members of the legislature by refusing to hear cases in which they or their firms have appeared, such problems have been adequately remedied by the transfer of the cases to other judges. Further, while a few experienced judges have retired in the last few years based on the lack of adequate compensation, there is no claim that there is a paucity of competent lawyers applying for positions on the bench. It is noted that in the New York City metropolitan area a large percentage of such applicants are made up of employees of *873 the court system and of prosecutors’ offices, with a relatively small percentage of applications coming from lawyers in private practice. Also, none of the four plaintiffs herein have set forth any facts indicating any specific interference with their independence in performing their judicial duties, and there is no claim here, as made in Marón v Silver,[2] that the judiciary is being punished by the legislature due to its displeasure with certain judicial decisions. In light of the foregoing, defendants contend that plaintiffs have not demonstrated a constitutionally impermissible interference to warrant the relief requested.
In the decision, I reviewed the law with respect to the principle of government mandating a separation of powers, noting that while the constitutions of several states expressly require such separation, in New York “this principle ... is included by implication in the pattern of government adopted by the State” (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 355-356 [1985]). It has been said that “one of the plain purposes of the . . . theory is to guard against one Branch seeking to maximize power” (Cohen v State of New York, 94 NY2d 1, 13 [1999]), and “that a foundation of free government is imperiled when any one of the coordinate branches . . . interferes with another” (Matter of County of Oneida v Berle, 49 NY2d 515, 522 [1980]). In People ex rel. Burby v Howland (155 NY 270, 282 [1898]), it was stated over a century ago that the “safety of free government rests upon the independence of each branch and the even balance of power between the three . . . [and if] any one of them [is weakened] by making it unduly dependent upon another[,] . . . a tendency toward . . . evil follows.” But even “when a branch does not arrogate power to itself, . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.” (Loving v United States, 517 US 748, 757 [1996].) It has been observed, however, that “[t]he concept of separation of powers is not one that is capable of precise legal definition and it does not yield clear solutions to intragovernmental disputes.”[3]
In Federalist No. 78, writing on the topic of the relative power of the three branches of government, Alexander Hamilton opined:
“[T]he judiciary is beyond comparison the weakest of the three departments of power; that it can never *874 attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks. . . . For I agree, that ‘there is no liberty, if the power of judging be not separated from the legislative and executive powers.’ And it proves, in the last place, that as liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments; that as all the effects of such a union must ensue from a dependence of the former on the latter, notwithstanding a nominal and apparent separation; that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches . . . .”
In Federalist No. 79, Hamilton, in discussing the constitutional restriction on diminishing a federal judge’s compensation, wrote:
“A POWER OVER A MAN’S SUBSISTENCE AMOUNTS TO A POWER OVER HIS WILL. And we can never hope to see realized in practice, the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants of the latter.”
While “the Judiciary has a duty ‘to defer to the Legislature in matters of policymaking’ ” (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14, 28 [2006]), and courts have recognized that “the manner by which the State addresses complex societal and government issues is a subject left to the discretion of the political branches of government” (Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 240 [1984]), here there is no open policy issue to be resolved as all parties have agreed that the judiciary is entitled to an adjustment and the amount thereof. The plain and simple reason that the adjustment has not occurred is due to the linkage referred to above.
In 2007, it appeared that to have a pay bill approved for the judiciary it was necessary for the Senate to pass a campaign finance reform bill, which would then cause the Governor to withdraw his threat to veto the pay bill (2007 NY Senate Bill S5313) passed by the Senate, which in turn would result in action in the Assembly on the companion pay bill introduced by *875 Speaker Silver. Clearly the judiciary institutionally had no interest in legislative pay or campaign finance reform, and obviously neither the Governor nor the legislature sought anything from the judiciary in return for a pay adjustment. The judiciary, the branch of government not involved in politics, was thus deprived of the agreed pay adjustment because of entirely extraneous issues that could not be resolved between the two political branches of government and over which the judiciary had no say.
In his concurring opinion in the recent decision in New York State Bd. of Elections v Lopez Torres (552 US —, —, 128 S Ct 791, 803 [2008]), relating to the State’s judicial convention system, Justice Kennedy wrote that the “rule of law, which is a foundation of freedom, presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute probity of its judges,” and that “it is unfair to them and to the concept of judicial independence if the State is indifferent to a selection process open to manipulation, criticism, and serious abuse.” The same can be said about the indifference of the State with respect to the compensation it pays its judges.
I n Matter of Kelch v Town Bd. of Town of Davenport (36 AD3d 1110 [3d Dept 2007]), where a local town board reduced the salary of a town justice, who was not subject to the nodiminishment-in-compensation provision of section 25 (a) of article VI of the NY Constitution, the court directed the board to set an appropriate salary, finding that its action in reducing the salary was a violation of the separation of powers doctrine. Similarly, in Matter of Catanise v Town of Fayette (148 AD2d 210 [4th Dept 1989]), a reduction by a town board of a town justice’s salary was held to be “an impermissible encroachment upon the independence of the júdiciary” (at 213). In New York County Lawyers’ Assn, v State of New York (294 AD2d 69 [1st Dept 2002]), the plaintiff bar association challenged the rates of compensation payable to assigned counsel appointed pursuant to article 18-B of the County Law. The court in denying dismissal of the complaint ruled that even “though the Legislature . . . established rates for compensation, the courts must have authority to examine that legislation to determine whether its monetary cap provisions create or result in the alleged constitutional infirmity” (at 72). The Court went on to say that it did not agree “with the State’s argument that the claim is not ripe for litigation due to the absence of specific alleged instances in *876 which the right to effective counsel has been violated, where the factual support provided tends to demonstrate only a prospective denial of that right” (at 73). In the subsequent decision in that case, the trial court increased the rates set forth in the statute, finding that such rates “created a severe and unacceptably high risk that children and indigent adults are receiving inadequate legal representation,” in violation of the United States and New York State Constitutions (New York County Lawyers’ Assn. v State of New York, 196 Misc 2d 761, 790 [Sup Ct, NY County 2003]).
In Glancey v Casey (447 Pa 77, 86, 288 A2d 812, 816 [1972]), the Chief Justice of the Pennsylvania Supreme Court wrote:
“We agree with the appellants that, even though the Constitution of 1968 simply mandates that judicial compensation shall be ‘fixed by law,’ ... it is the constitutional duty and the obligation of the legislature, in order to insure the independence of the judicial . . . branch of government, to provide compensation adequate in amount and commensurate with the duties and responsibilities of the judges involved. To do any less violates the very framework of our constitutional form of government.”
Subsequently, in Goodheart v Casey (521 Pa 316, 323-324, 555 A2d 1210, 1213 [1989], affd on reconsideration 523 Pa 188, 565 A2d 757 [1989]), it was written that:
“In order to insure the public’s right to a competent and independent judiciary, this Commonwealth must maintain its ability to attract and retain the most qualified people. Due to inflation, increased tax obligations and other economic factors, it can only do so by lessening the difference in compensation between judges and lawyers with equal experience and training in the private sector. Otherwise judicial service will no longer be viewed as a viable alternative to the private sector. Traditionally, government service offers pay scales to some extent lower than private industry for comparable positions requiring equivalent training, experience, responsibility and expertise. This disparity is deemed to be offset by the opportunity to render public service and to participate directly in the governmental process. However, this laudable motive cannot be reasonably expected to overcome the *877 stark realities of the market place. Compensation of appreciably lower than the expected value of those services will inevitably result in the inability to obtain the quality of performance required.”
The Supreme Court of Illinois, in Jorgensen v Blagojevich (211 Ill 2d 286, 313, 811 NE2d 652, 668 [2004]), wrote that
“the Judiciary must possess the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice, if it is to be in reality a co-equal, independent Branch of our Government.”
Although plaintiffs herein have not alleged any specific interference in the daily performance by them of their judicial duties, I find that, by reason of the practice of linkage discussed above, they have demonstrated that in denying them and the entire judicial branch of government a pay adjustment for almost a decade (during which time inflation has eroded judicial compensation by approximately 30%), the political branches of our state government have used the issue of judicial pay as a pawn in dealing with the unresolved political issue of legislative compensation, and that this linkage is an abuse of power by defendants and constitutes an unconstitutional interference upon the independence of the judiciary. The people of the State of New York are entitled to an independent judiciary and any improper interference not only adversely affects the judges, but is repugnant to our tripartite form of government and the liberties intended to be secured thereby.
While the complaint herein seeks a monetary award in addition to a declaration of unconstitutionality, during the prior oral argument on the motion to dismiss, plaintiffs’ counsel stated that the only remedy sought was the said declaration. However, on the instant motion plaintiffs have again altered the relief requested and are demanding a money judgment against the State of over $600,000 for each of the four plaintiffs, the amounts differing depending on the court in which each plaintiff is serving. The sums sought are based on cost of living increases since 2000, with interest. However, I believe that the proper remedy based on my aforesaid finding should, as previously requested by plaintiffs, be limited to a declaration of unconstitutionality, with the expectation that defendants will then take the appropriate remedial steps. As stated in Klostermann v *878 Cuomo (61 NY2d 525, 538-539 [1984]), the “primary purpose of declaratory judgments is to adjudicate the parties’ rights . . . [and] [t]he action . . . contemplates that the parties will voluntarily comply with the court’s order.”
While this action was brought by four judges, without any request that it be certified as a class action, it has at all times been recognized by the parties that the issue with respect to constitutionality affects all members of the judiciary who are part of the Unified Court System.
In light of the above, the motion of plaintiffs for summary judgment is granted to the extent of declaring that, based on the aforesaid facts, defendants, through the practice of linkage, have unconstitutionally abused their power by depriving the judiciary of any increase in compensation for almost a decade, and I direct that defendants, within 90 days of the date hereof, remedy such abuse by proceeding in good faith to adjust the compensation payable to members of the judiciary to reflect the increase in the cost of living since such pay was last adjusted in 1998, with an appropriate provision for retroactivity. Should defendants fail to remedy such unconstitutionality within the 90-day period, an application may be made to the court for consideration of other remedies.

. In addition to the citations referred to in footnote 4 of the decision (19 Misc 3d at 230), see Repairing New York’s Justice System (New York Times, June 2, 2008, section A, at 18 [“Assembly Democrats . . . have held judicial pay hostage while they maneuver for their own raises”]); Silver Lining for Judges (Newsday, May 7, 2008, section A, at 32 [“The Assembly has been holding the judges hostage. Legislators want a raise, too, but apparently worry that voters won’t much like it if they give themselves one. So they want to hide behind judges”]); A Judicial Mutiny: Our Opinion (Staten Island Advance, May 4, 2008, section B, at 2 [“Speaker Sheldon Silver . . . (has) effectively held the judges’ pay hike hostage by insisting, year after year, that any legislation to approve it must include a pay raise for lawmakers as well. He won’t approve one without the other”]); An Order for the Courts (New York Daily News, Apr. 24, 2006, at 32 [“New York State judges deserve a raise. . . . The villain here is the Legislature, which refuses to raise official salaries until lawmakers are ready to give themselves a boost too”]); Getting What We Pay For (New York Times, Dec. 10, 2006, at 13 [“In short, the judges’ pay is being held hostage by the Legislature. Lawmakers prefer to hide politically behind judicial robes and make their raises look like an afterthought”]); Judges Sue for Raises . . . While Setting Perverts Free (New York Post, Apr. 14, 2008, at 22 [“(judicial) salary hikes have been held hostage to Albany politics”]); State’s Chief Judge Sues Over Lack of Pay Increases (Wall Street Journal, Apr. 11, 2008, section A, at 2 [“State leaders agree judges’ raises are overdue. But the issue has been tied by lawmakers to politically sensitive raises for the legislators themselves”]); Editorial . . . Where is the Fairness? (Times Union [Albany, NY], Apr. 2, 2008 [“Yet lawmakers continue to hold judicial pay hostage to a raise for themselves, as a way of softening voter backlash when and if they do increase their own pay. That’s indefensible”]); An Injustice to Judges (New York Daily News, Mar. 31, 2008, at 26 [New York judges case for a pay raise is “open-and-shut. . . . But legislators balked, holding out for a package deal that would boost their $79,500 part-time salaries along with the judges’. The linkage makes no sense”]); Injustice to Judges (Times Union [Albany, NY], Feb. 7, 2008, at A10 [“But New York has a disgraceful tradition that ties pay raises for legislators to those for judges. Lawmakers are fearful voters will react angrily whenever they raise their own salaries, so they seek cover by giving judges a pay raise at the same time. . . . (T)he burden of defense squarely . . . belongs( ) on Speaker Silver’s shoulders”]); NY Judges Gone Wild (New York Post, Feb. 10, 2008, at 28 [“lawmakers — particularly Assembly Speaker Shelly Silver and his members— have used judicial pay as a political pawn”]).

. NYLJ, Dec. 6, 2007, at 29, col 1 (Sup Ct, Albany County).

. 1 Rotunda and Nowak, Treatise on Constitutional Law: Substance and Procedure § 3.12 (a) (4th ed).