[880 NYS2d 256]

Susan Larabee et al., Respondents-Appellants, v Governor of the State of New York, Respondent-Respondent, and New York State Senate et al., Appellants-Respondents.

First Department, June 2, 2009

### APPEARANCES OF COUNSEL

*Andrew M. Cuomo, Attorney General,* Albany (*Julie M. Sheridan* of counsel), for New York State Senate and another, appellants-respondents.

*Schlam Stone & Dolan, LLP,* New York City (*Richard H. Dolan, David J. Katz* and *Erik S. Groothuis* of counsel), for State of New York, appellant-respondent, and Governor of the State of New York, respondent-respondent.

*Cohen & Gresser, LLP,* New York City (*Thomas E. Bezanson* of counsel), and *Chadbourne & Parke, LLP,* New York City (*George Bundy Smith* and *J. Carson Pulley* of counsel), for respondents-appellants.

*Stroock & Stroock & Lavan LLP,* New York City (*Joseph L. Forstadt, Burton N. Lipshie, Jerry H. Goldfeder* and *Sandra Rampersaud* of counsel), for The Association of Justices of the Supreme Court of the State of New York and others, amici curiae.

*Suhana S. Han,* New York City (*Adam R. Brebner and Charles R. Korsmo* of counsel), for The New York County Lawyers' Association, amicus curiae.

*Wachtell, Lipton, Rosen & Katz,* New York City (*Bernard W. Nussbuam, George T. Conway III* and *Graham W. Meli* of counsel), and *Michael Colodner,* New York City, for Chief Judge Judith S. Kaye and another, amici curiae.

## OPINION OF THE COURT

Tom, J.

This is a lawsuit by members of the New York State Judiciary against various officials of the State of New York in which plaintiffs challenge the failure of the government of the State of New York to enact any enhancement in compensation for members of the State Judiciary.[1] Although the lawsuit asserts the rights of plaintiffs, it actually constitutes a legal challenge which pits the New York Judiciary against other branches of the state government. While only the individual plaintiffs' rights are at issue in the present case, these plaintiffs' claims involve policies allegedly encroaching upon New York's Judiciary as a distinct branch of government.

Plaintiffs are two Family Court Judges, a Civil Court Judge and a Criminal Court Judge sitting in courts within New York County, whose salaries are specified in Judiciary Law §§ 221-e and 221-g. Defendants include the Governor, the New York State Senate, the State Assembly, and the State of New York.

A review of some of the issues that gave rise to these lawsuits may provide a useful context to understanding not only why judges are suing the government of which they are a part, but also how the concepts of judicial independence and the doctrine of the separation of powers lie at the core of the present lawsuit. The New York Judiciary last received an increase in compensation on January 1, 1999 (L 1998, ch 630). As reported by the National Center for State Courts, this lapse of time is exceptional among state judiciaries, in that none of the others have experienced such an extensive delay in updating their salaries. Within a few years of the last enhancement of judicial compensation in New York, it became apparent that the rising cost of living in New York has consumed an increasing portion of judges' salaries. Although estimates vary, judicial salaries have lost between one quarter and one third of their value since the 1998 legislation was enacted.

The sheer complexity of much of New York's litigation, and its often crushing caseloads, require a fully operational, efficient and well-informed third branch of government, capable of managing its own affairs and presided over by well-qualified jurists trained to dispense justice efficiently and fairly. Many

---

1. There are two related cases pending: *Matter of Maron v Silver* (58 AD3d 102 [2008]) and *Kaye v Silver* (index No. 400763/08 [Sup Ct, NY County]), presently assigned to Justice Lehner. Dismissal and summary judgment motions have been argued in *Kaye v Silver*, and remain sub judice.

cases decided on a daily basis directly impact on all aspects of regional life, from alleviating heart-rending family crises, to depriving wrongdoers of their assets or even their liberty, to crafting decisions ensuring the continuing commercial stability of one of the world's leading financial centers. Resolution of the full range of these disputes typically requires application of sophisticated skills to multiple tasks in order to perform the adjudicative process.

During recent decades, compensation for New York legal professionals rose dramatically, with the anomalous result that salaries of young, newly minted lawyers often exceed those of the experienced jurists before whom they appear. It became broadly recognized by the middle years of the present decade that the erosion in the value of judicial salaries might potentially bring the court system to a precipice, as a generation of experienced jurists retired or sought other employment, while younger, highly qualified, attorneys too often sought nonjudicial careers. Leading members of the bench and bar began to publicly advocate in favor of adjusting judicial salaries to better account for the constant corrosive power of inflation, so as to retain experienced jurists and attract to judicial service the next generation of highly motivated lawyers.

Nevertheless, obscure and even arcane practices, primarily involving linkage of salary increases for judges to increases for legislators, have defeated the reasonable solution of increasing judicial compensation to a level commensurate with the responsibilities. Political leaders, including several governors and the leadership of each house of the Legislature, who often disagreed about many issues of government, in fact agreed on the necessity of such a measure. In 2006, the Judiciary submitted its budget request to the Governor, totaling approximately $1.6 billion, including a request for $69.5 million for judicial compensation adjustments. Pursuant to article VII, § 1 of the New York Constitution, the Governor forwarded the budget request for fiscal year 2006-2007 unaltered, and even noted his approval of the judicial salary increase.

In 2007, the Senate passed two bills to bring the salaries of New York trial judges in line with the salary of Federal District Court judges. One Senate bill (S5313) also sought to untangle the ritual of linking judicial salary increases to legislative salary increases by the expedient of appointing a commission to recommend legislative compensation adjustments on a routine basis. The Assembly declined to pass the companion bill (A7913)

when the Governor threatened to veto the measure unless the Legislature acquiesced in his demand for campaign finance reform. The Senate opposed the Governor's demand. The Assembly resisted advancing the measure because the Governor would not approve legislative pay raises. In the resulting stalemate, judicial compensation remained frozen. A second Senate bill (S6550), which omitted a legislative pay commission, passed almost unanimously in the Senate, but was not acted on by the Assembly.

By that time, the Chief Judge and others proposed a commission to regularly consider judicial salary levels as a means to, in effect, depoliticize the ritual of linkage. While both the executive branch and the legislative branch advocated for their respective agendas, the judicial branch was without a means to participate in the budgetary process. Compared with the other two branches of government, the Judiciary is at a disadvantage with respect to seeking public support for its interests, particularly as to pay raises. Nevertheless, $69.5 million was actually appropriated in the 2006-2007 budget for judicial salary increases and proposed retroactive payments (L 2006, ch 51, § 2), but no authorization to spend the sums was introduced or passed, nor was any bill introduced to amend Judiciary Law article 7-B to create a new schedule of judicial salaries. This inaction by the Legislature is the subject of the present appeal. The Governor also proposed judicial pay increases in the 2008-2009 executive budget that he submitted to the Legislature, but the Legislature declined to act.

The complaint, seeking declaratory and injunctive relief, set forth two causes of action. The first claim was that judicial compensation has suffered an unconstitutional diminution when measured against the substantial inflation since the last judicial pay raise, thus presenting a violation of article VI, § 25 (a) of the New York Constitution, which prohibits any diminishment of the compensation of enumerated judges and justices. Plaintiffs contended that, notwithstanding that the New York courts are among the busiest in the nation, the annual compensation levels of the New York Judiciary rank 12th in the nation measured in absolute terms. However, they asserted, the more accurate measurement is the value of those wages relative to the local cost of living. By this measure, New York judicial compensation drops to 48th in the nation. Plaintiffs claimed that the 26% increase in the cost of living since 1999 was ignored by the Legislature during the ensuing decade while judicial wages remained unchanged.

In the second cause of action, plaintiffs claimed that defendants repeatedly engaged in the unconstitutional practice of "linkage," whereby the political branches of New York government combined the consideration of legislation for judicial pay raises with unrelated matters. Plaintiffs specifically alleged that the allocation of $69.5 million became legislatively "impounded" because of the vituperative battling between the Governor and the Legislature over legislative salaries and campaign finance reform, which are inherently unrelated to the consideration of what salary levels are appropriate for the Judiciary. Plaintiffs argued that the timing of increases in judicial compensation in recent decades has not been coincidental. Rather, judicial salary increases were typically accompanied by legislative salary increases. Plaintiffs asserted that such a "linkage" between increases in judicial compensation and the Legislature's enhancement of its own salary levels was never constitutionally sanctioned in any explicit sense, yet, nevertheless, became a matter of legislative habit.[2] Plaintiffs claimed that the result of linkage in the present case was that because the Governor refused to condone legislative salary increases, the Legislature did not act on the proposed judicial salary increases notwithstanding public expressions of support. Plaintiffs asserted that the manner in which salary linkage was employed in the ongoing series of battles between the executive and legislative branches of state government economically punished the members of the judicial branch, necessarily implicating the independence of the Judiciary from those other branches of government in violation of the separation of powers doctrine.

In addition to seeking declaratory relief, the complaint sought orders compelling the disbursement of certain annual payments and enjoining defendants to hold the $69.5 million allocated for judicial salary increases in the 2006-2007 budget pending disbursement to New York judges and justices. Plaintiffs also sought to permanently enjoin defendants from linking judicial salary increases to legislative salary increases or other unrelated initiatives.

---

**2.** For instance, it appears that when judicial pay raises were considered in 1998, the issue also became mired in disputes between the Governor and the Legislature. The Governor's goal, to create 100 charter schools that were insulated from the teachers' unions, was negotiated with the Legislature, which wanted a 38% pay increase. In the meantime, judicial pay raises were not independently considered as a separate item. Ultimately, the Legislature acceded to the Governor's demand (*see* Gershman, *Lame Duck Session Likely to Confront A Rasher of Deals*, New York Sun, Nov. 29, 2006).

Two orders are presently under review. By pre-answer motion dated October 30, 2007, defendants moved, inter alia, to dismiss the complaint pursuant to CPLR 3211 (a) (7) for failure to state a cause of action, which resulted in the dismissal of the first cause of action and all claims against the Governor. Subsequently, plaintiffs moved for summary judgment on the second cause of action, which the court granted.

During oral argument on both motions, the parties made several concessions narrowing the issues to be decided. During the January 10, 2008 oral argument on the CPLR 3211 motion, defendants conceded that a judicial pay increase was in order, but argued that the legislative process provided the exclusive recourse under the New York Constitution. Although initially positing that the Legislature's action or inaction on such a measure was entirely insulated from constitutional challenge, defendants eventually conceded that the independence of the Judiciary as a discrete branch of government could be impaired, and the doctrine of separation of powers would then be violated, by inadequate judicial compensation, although it was claimed that the present salary levels did not implicate such constitutional concerns. Plaintiffs conceded that, insofar as they actually sought a legislative remedy, the Governor was not an essential party to the action.

In its order entered February 7, 2008, Supreme Court granted the CPLR 3211 motion in part (19 Misc 3d 226 [2008]). The court dismissed the complaint as against the Governor on the ground that the actual relief sought by plaintiffs required legislative action—passing a budget bill including judicial salary increases—and did not implicate an executive function. Rather, the court found that by acting in a quasi-legislative role, the Governor was entitled to legislative immunity. The court also found that dismissal was warranted because the Governor's role was at most a technical one, basically signing the legislation.

The court next concluded that judicial salaries had not been diminished within the meaning of New York Constitution, article VI, § 25 since no direct action had been taken by defendants to reduce judicial compensation. The court also found that plaintiffs had not suffered any economic impact distinct from others who were also affected by the inflation-induced erosion of compensation. However, the court denied that portion of defendants' CPLR 3211 motion seeking to dismiss the second cause of action. The court found that plaintiffs had sufficiently stated a claim that the legislative

conduct at issue infringed on the independence of the Judiciary and violated the doctrine of separation of powers.

Plaintiffs then moved for summary judgment on the second cause of action. In support of their separation of powers claim, plaintiffs cited to legal publications as well as general media articles reporting widespread public and professional support for a judicial pay increase, acknowledging the public benefits of an adequately compensated Judiciary, and explaining how linkage was politically manipulated in this case to effect a stalemate between the Governor and legislative leaders that collaterally deprived plaintiffs of the already appropriated salary increase.

During oral argument on the summary judgment motion, defendants reiterated the acknowledgment that members of the New York Judiciary deserved a salary increase, even conceding that defendants did not oppose an increase matching the salary paid to Federal District Court judges, but, again, insisted that achieving that goal remained the exclusive province of the Legislature. Defendants also conceded the basic aspects of plaintiffs' linkage claim.

In the second order under review, entered June 11, 2008, the court parsed the difference between linkage that might merely constitute bad policy and might not be judicially reviewable, and linkage that had constitutional ramifications (20 Misc 3d 866 [2008]). The court found that there was no policy dispute, since defendants agreed that judicial compensation should be increased. Rather, this case presented a disagreement involving the method of doing so, that is, whether any pay increase for the Judiciary was, of necessity, an exclusive legislative prerogative. The court found that the only reason why there had been no adjustment in judicial compensation during the past decade was the Legislature's insistence on linking any judicial pay increase to a simultaneous legislative pay increase, with the result that if no legislative pay increase was implemented, judicial pay increases were likewise postponed. Hence, the court found that the Judiciary's compensation was left unchanged solely because of entirely extraneous issues, irrelevant to the merits of the salary increase, which the two political branches could not resolve between themselves and as to which the Judiciary was without any forum to promote its interests. Supreme Court found that the constitutional infirmity arose from the abuse of power by which the political branches of government used the Judiciary as a pawn, thereby impermissibly infringing on its independence. The court further found that the device of

linkage, as employed by the Legislature, was "repugnant to our tripartite form of government" and violated the separation of powers doctrine (*id.* at 877).

The court declared defendants' actions to be unconstitutional. It directed defendants to remedy the abuse, within 90 days, by proceeding in good faith to adjust compensation payable to members of the Judiciary to reflect the increased cost of living since the last salary adjustment in 1998/1999. The remedial portion of the court's order has been stayed pending resolution of this appeal.

## DISCUSSION

Supreme Court's decisions and the information provided during oral argument amply demonstrate that a judicial salary increase is uncontroversial, has the support of the other branches of government and was even poised for final legislative action. We find that advancement of the measure foundered on the combination of the Assembly's refusal to act unless legislative pay increases were linked to any enhancement of judicial compensation, the Governor's refusal to approve any legislative salary increase unless his demands for, inter alia, campaign finance reform were satisfied, and the Senate's refusal to agree to the Governor's demands. It is obvious that none of these matters are even remotely related to the merits of an adjustment in judicial compensation, if those merits were to be independently considered. Hence, we agree with Supreme Court that it is manifestly clear that the only reason why the Legislature declined to finalize any measure to enhance judicial compensation, after such a lengthy delay, was that it perceived itself locked into an interbranch conflict with the Governor and was using the judicial branch to advance its own salary increase while simultaneously resisting campaign finance reform.

Moreover, we find that these facts do not present merely a pedestrian pay dispute involving state employees who happen to work for the Judiciary (*see* NY Const, art XIII, § 14; *cf. People v Ohrenstein*, 77 NY2d 38, 46 [1990] [the Legislature has power to establish salaries of state workers]), or even the judicial pay scales set forth in the Judiciary Law. Our concern transcends the particulars of how much, specifically, judges should earn, although that matter itself eminently deserves attention. Nor is this a challenge to a state budgetary and funding scheme (*cf. Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28 [2006]). Rather, we review the more important constitu-

tional problem presented by these facts: what otherwise would have been a routine exercise of legislative responsibility, that is, to authorize the expenditure of already appropriated funds for salaries as to which the Governor had communicated his assent (an outcome that was imminent), was turned into a political weapon against the Legislature's rival, the Governor. This outcome necessarily denigrated the third branch of government, and subordinated it to the competing political strategies of the other branches of government. That dynamic impinged on the independence of the Judiciary as a discrete branch of New York government. The question before us is whether these facts allow for a viable legal remedy.

The concern is not just that individual jurists are experiencing increasingly diminished economic security. Rather, our constitutional concern, as set forth below, is that the Legislature's self-serving grip on judicial compensation ultimately compromises the operation of the court system and thereby diminishes the Judiciary as a self-functioning, and thus independent, branch of government. After so many years of legislative inaction, and no indication that the Legislature seems inclined to abandon its customary practice of linkage, we are persuaded that the constitutional claim is ripe for review.

## DISMISSAL OF THE ACTION AGAINST THE GOVERNOR

■ Initially, we agree with Supreme Court that plaintiffs have no actionable claim against the Governor. There is no evidence that the State's Chief Executive exceeded his authority, or thwarted either the enactment of the judicial pay raise legislation or the expenditure of the appropriated funds for judicial compensation. To the contrary, the Governor facilitated the process by bringing the issue of judicial salaries to the Legislature by means of submitting the Judiciary's budget request to the Legislature unchanged, as he was required to do, and with his approval. His conflict with the Legislature was in connection with legislative matters; his refusal to approve a legislative pay increase, too, was related to those matters in dispute. The fact that the Legislature reacted by refusing to enact a judicial pay increase cannot be attributed to the Governor. Hence, as plaintiffs conceded in oral argument, the Governor is not properly part of this action and we affirm that part of the order dismissing the action against the Governor.

## THE COMPENSATION CLAUSE: ARTICLE VI, § 25

Plaintiffs contend that, taking into account a 30%[3] loss of purchasing power due to inflation since their last adjustment in salary, "the de facto 70 cents paid for judicial work today is less than the dollar paid in 1999." Plaintiffs perceive "a serious attack on the compensation of the Judiciary [which] . . . is no less devastating than a direct reduction of the number of salaried dollars," citing to federal case law purportedly recognizing that "cost of living adjustments are necessary to maintain compensation's value in the face of an inflationary environment" (*see e.g. Atkins v United States*, 556 F2d 1028, 1074 [Ct Cl 1977, Nichols, J., concurring], *cert denied* 434 US 1009 [1978]; *Williams v United States*, 240 F3d 1019, 1040 [2001], *cert denied* 535 US 911 [2002]).

Article VI, § 25 (a) of the New York Constitution, the State's equivalent to the Federal Constitution's "Compensation Clause," provides that the compensation of the constitutionally created judgeships enumerated therein "shall be established by law and shall not be diminished during the term of office for which he or she was elected or appointed." The New York provision parallels article III, § 1 of the United States Constitution, which also provides that judges' compensation "shall not be diminished during their Continuance in Office." The Federal Compensation Clause, and, by analogy, New York's provision, have their "roots in the longstanding Anglo-American tradition of an independent Judiciary. A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government" (*United States v Will*, 449 US 200, 217-218 [1980]). The Compensation Clause, providing a means by which judicial salaries may be adjusted for inflation but vesting the mechanics of doing so in the Legislature, recognizes the need to "accept[ ] a limited risk of external influence in order to accommodate the need to raise judges' salaries when times change[ ]" (*id.* at 220).

The central issue herein is whether diminishment results only when there has been an affirmative reduction of compensation, consisting of the pay scale and benefits, below that which was available when the jurist entered office, or whether a more flexible construction is permissible which includes a gradual

---

**3.** The estimated increase in the cost of living, including inflation, as set forth in the record and briefs, ranges from 26% to 30%.

diminution of the relative value of wages and benefits over a period of time. In effect, plaintiffs, advocating for the latter construction, juxtapose their nominal salaries against the spending power of those salaries as years go by.

■ We agree with Supreme Court that the legislative inaction did not "diminish" judicial compensation by reducing wages or benefits in any direct fashion, and that this is the operative consideration. Notably, New York Constitution, article VI, § 25 (a) states that *"compensation . . . shall not be diminished"* (emphasis added), rather than addressing itself to the *relative value* of that compensation. Even as a practical matter, though, if we were to adopt plaintiffs' construction of article VI, § 25 (a), it would follow that some standard would have to be devised to determine at what pace, and at what point, "diminishment" occurs because wages and benefits have slipped behind the rate of inflation. The present action does not provide a basis for us to determine, as a general principle, the point at which salary "diminishment" occurs within the meaning of article VI, § 25 (a), because salaries have lagged behind inflation and the cost of living, and we are not prepared to undertake that task. Although the type of commission proposed elsewhere to evaluate the pace of increases in judicial compensation makes sound sense, that is not our present role.

In any event, the scarce case law interpreting article VI, § 25 (a) does not support plaintiffs' construction. In *Matter of Benvenga v LaGuardia* (294 NY 526 [1945]), the New York City Board of Estimate issued a series of resolutions reducing the City's annual contribution to the salaries of certain justices. This was an actual reduction in salary, which violated the constitutional prohibition against the diminishment of judicial compensation and supports our construction of article VI, § 25 (a). In *Black v Graves* (257 App Div 176 [1939], *affd* 281 NY 792 [1939]), by contrast, the Court rejected the claim that requiring a judge to pay a personal income tax constituted an unconstitutional diminishment of compensation. The plaintiff in that case had previously enjoyed an exemption from income tax obligations that was applicable to judges but was eliminated during the plaintiff's term of office. The concurring opinion in the Appellate Division noted a theme later articulated in *United States v Hatter* (532 US 557, 569-572 [2001]), that paying taxes is merely an incident of citizenship, universally applicable, and is not a targeted diminishment of judicial compensation. Notably, that reasoning has logical force for the present case, in that the

absolute salaries are not being reduced. Rather, only the relative value of the net compensation has been affected, a consequence of inflation that affects other persons in addition to plaintiffs. In *Hatter*, the United States Supreme Court drew a sharp distinction between an affirmative legislative reduction of salary—an unconstitutional exercise of power—and indirect effects on judicial salaries that are not unique to, or targeted at, the Judiciary.

In *United States v Will* (449 US 200 [1980], *supra*), the Court noted that a concern for the "ravages of inflation" (*id.* at 220) on judicial compensation and the fear that an underfunded Judiciary might too easily lose its special status motivated the draftsmen of the Federal Constitution, notably Madison, Hamilton and Morris, to devise the unidirectional nature of the Compensation Clause: judicial salaries could be increased but not decreased (*id.* at 220-224). However, in *Atkins v United States*, the Federal Court of Claims, after a comprehensive discussion of the framers' intent in selecting the particular phrasing in the Compensation Clause, addressed, but nevertheless rejected, claims that the protections of the Compensation Clause are necessarily invoked when judicial salaries lose real value in the face of substantial inflation. Inflation only presents a nonactionable "indirect, nondiscriminatory lowering of judicial compensation" (*Atkins*, 556 F2d at 1051).

The Third Department recently analyzed the same facts in *Matter of Maron v Silver* (58 AD3d 102 [2008], *supra*), also concluding that inflation and the escalation in the cost of living in New York do not constitute the diminishment of judicial compensation within the meaning of article VI, § 25 (a) in the face of the Legislature's inaction. The Third Department therein stated that "the Compensation Clause neither offers complete protection of the purchasing power of judicial salaries nor mandates cost of living adjustments to offset inflation" (*id.* at 111), a conclusion with which we agree.

Accordingly, we affirm the February 7, 2008 order of Supreme Court insofar as it dismissed the Compensation Clause claim (first cause of action).

## LEGISLATIVE IMMUNITY

With respect to the second cause of action, defendants assert absolute immunity by operation of the Speech or Debate Clause

of NY Constitution, article III, § 11.[4] They argue that by virtue of the Speech or Debate Clause, a court is not empowered to inquire into the Legislature's reasons for adopting or not adopting particular measures which thus remain beyond judicial review. Defendants characterize Supreme Court's linkage analysis as an exercise in speculation about the motives of its members, and a constitutionally prohibited inquiry relating to core legislative functions. Defendants describe decisions to pass or not pass bills as "the quintessential (and wholly proper) give and take of political compromise in a representative democracy." Finally, defendants argue that legislative immunity is not abrogated even as to unconstitutional or illegal actions.

Legislative immunity has been described as "an attempted accommodation of the competing constitutional commitments to judicial review and legislative autonomy" (Tribe, American Constitutional Law § 5-20, at 1019 [3d ed 2000]). The Speech or Debate Clause states that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place" (NY Const, art III, § 11). This spare phrasing has been interpreted as creating an immunity that is as broad as the immunity enjoyed by Congress under federal law (*People v Ohrenstein*, 77 NY2d at 53-54). The federal constitutional provision (US Const, art I, § 6) was, itself, the outcome of a lengthy common-law tradition founded in the experience of political conflicts that arose within the English government and among the diverse governing bodies of the American colonies, which also found expression in New York's 1787 Bill of Rights (*Tenney v Brandhove*, 341 US 367, 372-376 [1951]).

The original purpose of legislative immunity was to insulate legislators from intimidation by the executive branch as well as protect them from being held accountable for their legislative acts by a possibly hostile Judiciary (*Eastland v United States*

---

4. In dismissing the complaint against the Governor, Supreme Court relied, in part, on legislative immunity, a defense raised in that context, and on behalf of legislators, in defendants' memorandum of law in support of their motion to dismiss and argued during oral argument before Supreme Court. Plaintiffs claim that the defense was waived with respect to the legislative bodies since it was not articulated in those terms. Although the defense was weakly articulated in that sense, we recognize that each house of the Legislature necessarily acts through its individual members. Moreover, implicit in Supreme Court's ruling with respect to the Governor was the finding that there was legislative immunity in the first place. We affirm the order dismissing the action against the Governor on different grounds. Nevertheless, the issue of legislative immunity was sufficiently in issue below as to require review on appeal.

*Servicemen's Fund*, 421 US 491, 502 [1975]; *Gravel v United States*, 408 US 606, 616 [1972]). The immunity has expanded in recognition of the importance of allowing a legislator to independently discharge his or her duties free from the chilling effects of lawsuits seeking damages or the compulsion of injunctions directing a legislator how to vote (*see Tenney v Brandhove*, 341 US 367 [1951], *supra*; *Gravel v United States*, 408 US 606 [1972], *supra*). An official should be able to make decisions necessary for the public good, and faithfully perform the responsibilities of office, without fear of personal liability that otherwise might discourage fidelity to those responsibilities (*Scheuer v Rhodes*, 416 US 232, 241-242 [1974]). Legislative immunity allows legislators to be free

> "from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good . . . The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial . . . or to the hazard of a judgment . . . based upon a jury's speculation as to motives" (*Tenney*, 341 US at 377).

Notwithstanding the constitutional nomenclature, legislative immunity applies not only to speeches and debates, but also to acts that fall within "the sphere of legitimate legislative activity" (*id.* at 376, 376-378 [conduct of legislative committee immunized]; *Eastland*, 421 US at 502). In interpreting the Clause, courts take a practical rather than a strictly literal approach, which otherwise would limit its protections to "utterances made within the four walls of [the Legislature]" (*Hutchinson v Proxmire*, 443 US 111, 124 [1979]). The protected activities include other legislative functions such as voting and committee work (*Gravel*, 408 US at 624; *Matter of Straniere v Silver*, 218 AD2d 80, 83 [1996], *affd* 89 NY2d 825 [1996]), and even investigations (*Eastland*, 421 US at 504). The immunity correlates with acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House" (*Gravel*, 408 US at 625), including the regular and usual budgetary decisions involving departmental funding (*Bogan v Scott-Harris*, 523 US 44 [1998]).

However, considering the impervious nature of the immunity, if applicable, courts have been parsimonious in invoking it. It

does not necessarily insulate the outcome of legislative conduct from the judicial review of its constitutionality. That is, individual statements of legislators or legislative acts may be protected from litigation, but it does not automatically follow that the manner in which legislative decisions are made is similarly protected; otherwise, the fundamental purpose of judicial review, to determine the constitutionality of governmental acts, would be eviscerated. Since the goal is to protect legislators from harassment caused by litigation, lawsuits challenging the constitutionality of legislative decisions, which do not impede that goal, are not barred (*see Powell v McCormack*, 395 US 486, 504-505 [1969]). Not all acts by legislators acting in an official capacity are functionally legislative in nature; the immunity conferred by the Speech or Debate Clause does not extend beyond the "legislative sphere" (*Gravel*, 408 US at 624-625). As noted by the Supreme Court, "[t]he gloss going beyond a strictly literal reading of the Clause has not, however, departed from the objective of protecting only legislative activities" (*Hutchinson*, 443 US at 125).

> "The heart of the Clause is speech or debate . . . Insofar as the Clause is construed to reach other matters, *they must be an integral part of the deliberative and communicative processes* by which [legislators] participate in committee and [legislative] proceedings with respect to the consideration and passage or rejection of proposed legislation . . . [T]he courts have extended the privilege to matters beyond pure speech or debate . . . but only when necessary to prevent indirect impairment of such deliberations" (*Gravel*, 408 US at 625 [internal quotation marks and citation omitted]; *accord Hutchinson*, 443 US at 126-127 [with reference to defamatory speech outside of legislative function]).

"The line separating protected from unprotected legislative activity is ultimately one between 'purely legislative activities' and 'political' matters" (*Straniere*, 218 AD2d at 83, quoting *United States v Brewster*, 408 US 501, 512 [1972]; *see* Tribe, American Constitutional Law, at 1016-1020).

Hence, legislative interactions with the executive branch might further legislative interests, but would not generally be protected legislative activity (*Gravel*, 408 US at 625). Nor would protection be required for legislators' issuance of press releases (*Straniere*, 218 AD2d at 83; *People v Ohrenstein*, 77 NY2d at 54)

or their public statements, even if such are tangentially related to speech or debate that might be immunized (*Hutchinson*, 443 US at 131-132). Even if legislative statements resulting in a decision or action are immune, the unlawful discharge of an immunized decision might not itself be within the circle of immunity, if it is not essential to legislative independence (*Gravel*, 408 US at 621). As noted by Professor Tribe, "to the extent that legislative and nonlegislative actions are entangled in practice, the privileged status of legislative action does not preclude its judicial review," which may still be accomplished without formally requiring individual legislators "to answer personally for legislative acts" (Tribe, American Constitutional Law § 5-20, at 1019). Courts are empowered to determine the constitutional boundaries of each branch of government (*Pataki v New York State Assembly*, 4 NY3d 75, 96 [2004]) and whether an action is within the purview of legitimate legislative activity (*Straniere*, 218 AD2d at 85).

█ We find that legislative immunity is unavailable to shield defendants from plaintiffs' separation of powers claim. Since no member of the Legislature has been named a defendant in his or her individual capacity, we need not be concerned with the historical and entirely appropriate concern that a legislator might be harmed by the prospect of civil or even criminal liability as a consequence of his or her unfettered discharge of legislative duties.

To the extent that the Speech or Debate Clause bars inquiry into the motivations underlying legislative decisions and communications, those concerns are academic, considering that the record is replete with information, including public statements by legislative leaders, explaining why judicial salary increases were abandoned at the eleventh hour (*Straniere*, 218 AD2d at 83; *Hutchinson*, 443 US at 131-132). Defendants essentially conceded that linkage was the causative factor in this case. We are not reviewing legislative "communication or deliberation." We need only look to the outward manifestation of the contentious relationship between the Governor and the respective legislative bodies when linkage was employed to alternatively block or prod action by the Governor on matters that were fundamentally unrelated to the harm ultimately suffered by plaintiffs as members of the Judiciary. Our focus, thus, is on the overtly political manner in which linkage was employed. In this regard we differ with the approach taken by the Third Department in *Matter of Maron v Silver* (58 AD3d 102 [2008], *supra*),

which concluded that no remedy was available because legislative immunity precluded a challenge to the Legislature's inaction with respect to a judicial pay increase (*id.* at 120-121).

Defendants, though, claim that linkage is a policy decision and, as such, it is inherently a legislative function protected from a judicial challenge to the manner in which it is employed. The New York Constitution, as well as the statutory law governing the respective branches of government, is silent on linkage, which, as a result, does not benefit from any particular legal imprimatur. Linkage as applied seems to be merely a legislative custom that served no legitimate legislative purpose other than to facilitate the personal remunerative goals of its members. Thus, the practice of linkage does not enjoy any particular recognition as a legislative function in and of itself.

The Supreme Court's ruling in *Bogan v Scott-Harris* (523 US 44 [1998], *supra*), upon which defendants rely, does not constrain our analysis. The decision, in an action commenced under 42 USC § 1983, noted the extant protections afforded state and federal officials, then found that alternative remedies were still available against municipal corporations should legislative immunity be extended to municipal officials (*id.* at 53). Those underpinnings of the decision, of course, are inapplicable to the present dispute. The Supreme Court probed whether the challenged conduct in that case—eliminating a department from the city budget—was consonant with a legislative function. It so happened that the plaintiff, who had an acrimonious history with some municipal officials, was the sole employee of the department being eliminated. The Supreme Court declined to inquire into the Legislature's motives, since eliminating a department traditionally was a budgetary, and hence a legislative, function and the legislative motive was potentially explainable as such. Obviously, the present case does not involve a city council decision whether to fund a municipal agency falling under its jurisdiction. Moreover, unlike *Bogan*, the failure to increase judicial compensation can only be explained by reference to the political conflicts between the Legislature and the Chief Executive, which had no relation to budgetary considerations pertaining to judicial compensation. Although the Supreme Court in *Bogan* conferred deference on legislatures *regarding* the allocation of resources, defendants herein have never asserted that a different allocation of resources was called for.

In this case, the political back and forth between the Governor and the respective houses of the Legislature manifested itself in

discussions and positioning that gravitated beyond the boundaries of the Legislature's internal communications, debates, committee work, investigations and the like which rest within the legislative sphere, as that cloistered notion has traditionally been understood. Under these circumstances, we cannot conclude that judicial review of this constitutional challenge is barred by operation of the Speech or Debate Clause. Since legislative immunity is inapplicable, we turn to defendants' claim that the separation of powers is not implicated.

## SEPARATION OF POWERS

■ We agree with the Supreme Court's decision to grant plaintiffs' summary judgment motion on their second cause of action. Plaintiffs allege that linkage as employed in this case violated the doctrine of the separation of powers, an essential component of our constitutional form of government. The structure of both our state and our federal governments provides for three separate, coequal branches of government. Hence, our analysis focuses in large part on whether defendants under the circumstances of this case have distorted that carefully balanced structure.

Defendants maintain that they did not transgress the separation of powers but, rather, acted in conformity with the powers conferred on them by the State Constitution so that their actions were, a fortiori, constitutional. However, the facts are undisputed that the legislative branch, rather than being solely engaged in a legislative function, was using the Judiciary tactically in a political battle with the Governor. The question is whether this legislative action sufficiently threatened the independence of the judicial branch of government as to violate the doctrine of separation of powers. We focus not so much on the legislative inaction—not implementing a judicial salary increase—but on its action—making a judicial salary increase contingent on its own success in achieving a legislative pay increase. The principle underlying plaintiffs' second cause of action is that judicial review becomes necessary when the functional independence of the Judiciary is threatened (*see Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d 1110, 1112 [3d Dept 2007] [municipality's establishment of an unduly meager salary for a new town justice threatened judicial independence]).

Since the dispute originates with funding, the analysis regarding this aspect of the relations among the branches of govern-

ment necessarily starts with identifying the means by which members of the Judiciary are compensated. Notably, the New York Constitution sets forth the provisions relating to compensation for each branch of government, not in article III governing the Legislature, but in the particular article for each branch, none of which mirrors the other. As already noted, article VI, § 25 (a) provides the constitutional linchpin for compensating plaintiffs and certain other judicial classifications, whose salaries are specified in Judiciary Law article 7-B (§ 220 *et seq.*), and are to be paid by annual appropriations pursuant to Judiciary Law § 39, which may be increased only by appropriation (art VII, § 7). The Governor's salary is to be fixed by joint resolution of the Senate and Assembly (art IV, § 3). The Legislature may increase or decrease legislative salaries, but not for the term in which a legislator was elected (art III, § 6). This structural scheme suggests, at the outset, that the Judiciary was not intended to be subordinated to legislative whim on matters of compensation, notwithstanding the legal necessity that salary increases must be appropriated and implemented as part of the budgetary process because no state money may be spent except pursuant to a budget appropriation.[5]

It was noted in early New York case law that the "object of a written Constitution is to regulate, define and limit the powers of government by assigning to the executive, legislative and judicial branches distinct and independent powers," in furtherance of a stability that "rests upon the independence of each branch and the even balance of power between the three" (*People ex rel. Burby v Howland*, 155 NY 270, 282 [1898]). Insofar as the Judiciary has already been recognized to be the weakest of the branches of government, which "might be dwarfed or swayed by the . . . legislative" (*Evans v Gore*, 253

---

5. For a history explaining why any spending measure must begin as an appropriation, see *Pataki v New York State Assembly* (4 NY3d at 80-85; *see also* John Buckley, *The Governor—From Figurehead to Prime Minister: A Historical Study of the New York State Constitution and the Shift of Basic Power to the Chief Executive*, 68 Alb L Rev 865 [2005] [the author is a member of this Court]). The present constitutional requirement is the result of an evolutionary movement away from the excessively political and fiscally unsound history of ad hoc spending by the Legislature to a more unified process under executive control, thereby shifting the balance of power to the Chief Executive, and away from the Legislature, on budgetary matters. Nowhere is it evident that the Judiciary as a branch of government was accorded a lesser constitutional status in either the historic or the present process. For a history of the judicial review of the executive budget, see Buckley (*id.* at 886-904).

US 245, 249 [1920], *overruled in part by United States v Hatter*, 532 US 557 [2001]), the concern becomes acute that it could be "[w]eaken[ed] . . . by making it unduly dependent upon" the Legislature (*Burby*, 155 NY at 282). Legislative action that "hampers judicial action or interferes with the discharge of judicial functions is in conflict with the principles of the Constitution" (*id.*). The manner in which the powers of the distinct branches of government are separated or conjoined springs from the recognition that the independence of the Judiciary is especially relevant to the purpose and continued stability of government itself (*id.*).

In New York, the doctrine of the separation of powers inheres "by implication in the pattern of government adopted by the State" (*Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 355-356 [1985]). The New York Court of Appeals, which early recognized that making any branch unduly dependent on another branch weakens the dependent branch and thereby upsets the delicate balance of power (*Burby*, 155 NY at 282), characterizes the doctrine as a means to impede "one [b]ranch [of government] seeking to maximize power" (*Cohen v State of New York*, 94 NY2d 1, 13 [1999]; *see also Matter of County of Oneida v Berle*, 49 NY2d 515, 522 [1980]). The Court of Appeals has afforded a continuing vitality to the doctrine as applied to intragovernmental disputes (*Under 21, Catholic Home Bur. for Dependent Children*, 65 NY2d at 356).

Hence, it would be inappropriate for a court to sit in review of the Legislature's wholly internal affairs or practices, or, conversely, of the Governor's limited, though exclusive, quasi-legislative constitutional prerogatives (*Urban Justice Ctr. v Pataki*, 38 AD3d 20 [2006], *lv denied* 8 NY3d 958 [2007]). However, it follows that those branches of government may not act to the detriment of the judicial branch's own ability to function without interference. That consideration is at the heart of judicial independence from the perspective of the separation of powers.

The judicial system is at its best when it stands above and apart from the political interactions that more typically characterize the other two branches of government. Yet, the third branch of government is effectively dependent on the other two branches in matters of compensation. The political branches of government must discharge the responsibility of considering, and acting upon, an enhancement in judicial salaries on its objective merit.

The intersection of the separation of powers and judicial compensation has a lengthy history. Salary disputes that pitted a Legislature against the Judiciary have occurred since the early days of the Republic. Certain general themes have emerged which underscore the delicate intragovernmental relations that are threatened when legislative bodies, on the basis of various motives and agendas, act in ways that financially burden judges as they perform their duties, even if their compensation is not, nominally, "diminished," and even if the burden does not directly distort the performance of those duties.

Shortly after the ratification of the United States Constitution, the judges of the Virginia Court of Appeals, in a "respectful remonstrance" directed to the Virginia Assembly, cautioned that the unique role undertaken by the Judiciary, to protect the people from the powers of government if need be, required that relations between the branches of government be managed "to exclude a dependence on the legislature" (*In re Judges of Ct. of Appeals*, 8 Va 135, 141, 143-145 [1788]). Those judges warned that a dependency contrary to the newly crafted scheme of government could easily arise as a consequence of the subordination of the Judiciary to the Legislature in matters of compensation.

During the early part of the twentieth century, the United States Supreme Court noted the importance of ensuring a judge's "sure and continuing right to the compensation, whereon he confidently may rely for his support during his continuance in office" (*Evans v Gore*, 253 US at 249). Adequate judicial compensation was analyzed not as a benefit to the judge, but "as a limitation imposed in the public interest" so as "to attract good and competent men to the bench and to promote that independence of action" necessary to the administration of the system of justice (*id.* at 253). Elsewhere, also in the context of a compensation dispute, the Supreme Court characterized the peculiarly American scheme of government as a "separation [which] is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital . . . , namely, to preclude a commingling of these essentially different powers of government in the same hands" (*O'Donoghue v United States*, 289 US 516, 530 [1933]). There, the Supreme Court cautioned that each branch of government "should be kept completely independent of the others" in the sense that none should be subjected to duress by either of the other branches (*id.*). The Supreme Court therein noted the "anxiety of the framers of the Constitution to

preserve the independence especially of the judicial department" (*id.* at 531). Hence, American jurisprudence recognized early that matters of judicial compensation are inextricably intertwined with judicial independence vis-à-vis the legislative branch of government, requiring "a continuing guaranty of an independent judicial administration for the benefit of the whole people" (*id.* at 533).

More recently, in a pay dispute, the Supreme Court described the separation of powers doctrine, albeit under different circumstances, as

> "a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified. In its major features . . . it is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict" (*Plaut v Spendthrift Farm, Inc.*, 514 US 211, 239 [1995]).

An erosion of the functional independence of the Judiciary may be incremental, and subtle, yet, unlike the political branches of government, the judicial branch is not empowered to assert its interests by means of politics. If the acts of another branch of government threaten the functional independence of the Judiciary as an institution, then the "separateness" of those branches may become illusory.

Here, there has been a violation of the doctrine of separation of powers. We assume, as did the Supreme Court in *Hatter*, that there is no legislative ill will toward the Judiciary in the events giving rise to this litigation, and we need not find that the Legislature intentionally intruded upon the independence of the judicial branch of government. Our conclusion also does not require evidence relating to the integrity of judging in individual cases, and, indeed, there is no record evidence of undue influence. Rather, we are concerned with the integrity, in a structural sense, of the judicial system as an independent institution, in that New York's constitutional architecture prohibits the subordination of the judicial branch to the other branches of government either in practice or in principle. More significantly, the political maneuvering by the other branches of government, by reducing the issue of judicial compensation to a tactical weapon, consequentially subordinated the status of the Judiciary to that of an inferior governmental entity. Linkage, as employed in these circumstances, manifested an abandonment

of any pretense to an objective consideration of judicial compensation unimpeded by extraneous political considerations. These acts and their ramifications necessarily undermine the carefully constructed architecture of New York government.

Defendants argue that linkage benefitted the Judiciary in the past when judicial salary increases accompanied legislative salary increases with no affront to New York's constitutional framework of government, so that plaintiffs' separation of powers claim, arising only when they have not benefitted at present, should be rejected. However, the fact that in the past the Judiciary may have, by happenstance, benefitted from linkage would not necessarily have ratified the propriety of the Legislature's practice. Moreover, there is a practical basis to reject any correlation between judicial and legislative compensation, notwithstanding the linkage of past "benefits." Placing judicial compensation and legislative pay on an equal footing, although perhaps politically convenient, is an illusory comparison. "Linkage" in this sense is innately skewed against the Judiciary because the members of the respective branches of government are differently situated economically. Legislators are not barred from outside employment, and many enjoy considerable revenue from other activities, an economic capacity that is denied, with very narrow exceptions, to members of the Judiciary. The Legislature, too, may be free to time its own salary increases to accompany judicial salary increases. But that is not the gravamen of the present dispute, where linkage was employed to restrict the implementation of updates for judicial compensation until such time as the Legislature found it expedient to give itself a raise. Judicial compensation, rather than being independently addressed, became contingent on the Legislature's treatment of its own members.

We disagree with the conclusions of the Third Department in *Matter of Maron v Silver* (58 AD3d 102 [2008], *supra*), which, inter alia, looked for evidence of a present impairment of the judicial system as a prerequisite to the viability of a separation of powers claim. Although that kind of evidence could be sufficient to state the claim, we do not find it to be a prerequisite (*see e.g. New York County Lawyers' Assn. v State of New York*, 294 AD2d 69, 73-74 [2002] [claims of prospective harm to court system valid as basis for preventative remedies]). The threat to judicial independence arises not only from specific instances of legislative or executive overreaching, but, also when political jousting erodes the institutional barricades which protect the

judicial branch. Thus, it is the manner in which the Legislature employed linkage that implicates the separation of powers doctrine. The absence of evidence of undue influence, or of current systemic operational deficiencies, is not dispositive. We are also mindful of the many concerns set forth in the record about the future retention of qualified jurists and the attraction of highly qualified attorneys to the bench as judges retire or otherwise leave. However, we are concerned with not only the prospective harm to the functioning of the court system, but also with the manner in which linkage distorted the relationships among the branches of government implicit in New York's constitutional framework. Our conclusions in this latter regard proceed from the consequential exploitation of the Judiciary, not any present impairment in its operations. The constitutional defect is predicated on the manifest affront to the Judiciary's structural independence (*Plaut*, 514 US at 239).

The Legislature, by subordinating the Judiciary to its whims and caprices in matters of salary adjustments, brings the Judiciary closer to the world of politics than is tolerable for the disinterested functioning of a court system that must act for "the benefit of the whole people" (*O'Donoghue*, 289 US at 533). The fact that salary adjustments for the third branch of government became politicized as the byproduct of an interbranch conflict removes this case from the otherwise mechanical processes for adjusting judicial compensation. When judicial compensation becomes politicized, a line has been crossed in contravention of the warnings long articulated in what has become a deeply rooted constitutional jurisprudence. The basic tenet of the separation of powers doctrine, to promote and maintain the independence and stability of each branch of government, has been violated.

We conclude with the observation already made above that, consistent with our concern that judicial compensation should be as far removed as is practicable from political considerations, it makes sound sense to delegate the issue of judicial compensation to a commission created for that purpose, to analyze and make recommendations to the Legislature on the timing and scope of future increases in judicial salaries, a device that had utility in *Campaign for Fiscal Equity v State of New York* (100 NY2d 893 [2003], *after remand* 8 NY3d 14 [2006]).

Accordingly, the order of the Supreme Court, New York County (Edward H. Lehner, J.), entered February 7, 2008, which, insofar as appealed from as limited by the briefs, granted

defendants' motion to dismiss the complaint to the extent of dismissing the complaint as against defendant Governor of the State of New York and dismissing plaintiffs' first cause of action as against the remaining defendants, and denied the motion to the extent it sought dismissal of the second cause of action, and the order of the same court and Justice, entered June 11, 2008, which granted plaintiffs' motion for summary judgment on their second cause of action declaring that the remaining defendants through the practice of linkage unconstitutionally abused their power by depriving the Judiciary of any increase in compensation for approximately 10 years and directing that the remaining defendants proceed in good faith to adjust judicial compensation to reflect the increase in the cost of living since 1998, with leave to apply for consideration of other remedies should the remaining defendants fail to act within 90 days, should be affirmed, without costs.

GONZALEZ, P.J., NARDELLI, MOSKOWITZ and RENWICK, JJ., concur.

Order, Supreme Court, New York County, entered February 7, 2008, and order, same court, entered June 11, 2008, affirmed, without costs.