DILLON, J. (concurring).
Contributions by the State of New York toward the cost of health care insurance premiums provided to the judges and justices of the Unified Court System are part of the paid "compensation" that falls within the protective provisions of the State Constitution, article VI, § 25(a) (the Compensation Clause). For reasons set forth below, the Compensation Clause would be irrelevant to the State's health care insurance contributions if the controlling constitutional language merely guaranteed that no judicial "salary" be diminished during jurists' terms in office. However, the presence of the broader term "compensation" in the Compensation Clause casts a wider net that includes more than mere salary.
I.
The bench and bar are frequently called upon to interpret the precise meaning of words and phrases in constitutions, ***447 statutes, contracts, wills, and other legal documents. Such issues are parsed by examining words and phrases in accordance with plain language, the drafters' intent, the contexts in which words and phrases are applied, common usages and understandings, the parties' reasonable expectations, and the affordance of meaning that is consistent with the whole of the document being examined. These concepts are not alien to the interpretation of provisions in our State Constitution. We have held that the Compensation Clause is to be construed in a manner "to give its *827 **28 provisions practical effect" ( Ginsberg v. Purcell, 51 N.Y.2d 272, 276, 434 N.Y.S.2d 147, 414 N.E.2d 648 [1980] ; see also Pfingst v. State of New York, 57 A.D.2d 163, 165, 393 N.Y.S.2d 803 [1977] ). The Compensation Clause is to be given "a fair and liberal construction, not only according to its letter, but also according to its spirit and the general purposes of its enactment" ( Pfingst v. State of New York, 57 A.D.2d at 165, 393 N.Y.S.2d 803 ; see People ex rel. McClelland v. Roberts, 148 N.Y. 360, 42 N.E. 1082 [1896] ).
The New York State Constitution has had a rich and evolving history. Constitutional conventions were convened in 1776-1777, 1821, 1846, 1867-1868, 1894, 1915, 1938, 1967, and a Constitutional Commission was established for 1872-1873 (see Albany Law School, Schaffer Law Library's Guide on the New York State Constitution, available at https://www.albanylaw.edu/media/user/librarypdfs/guides/nyconsti.pdf). The recommended Constitutions were adopted only for the years 1777, 1821, 1846, 1894 and 1938 (see Historical Society of the New York Courts, New York State Constitutions, available at https://www.nycourts.gov/history/legal-history-new-york/history-new-york-courts-constitutions.html). Along the way, there were many years where voters approved ad hoc amendments to the then-existing Constitutions including, as relevant here, 1925 and 1961.
The first Constitution to address the issue of compensation for state officeholders was that of 1821.[1] It provided in articles I and III that "compensation" be paid to members of the State Legislature and to the governor (see 1821 N.Y. Const., art. I, § 9; art. III, § 4), but curiously made no reference to judicial pay. The Constitution of 1846 addressed judicial remuneration for the first time, entitling the state legislators, Governor, Lieutenant Governor, and justices to "compensation" in exchange for the performance of their duties (see 1846 N.Y. Const., art. III, § 6; art. IV, §§ 4, 8; art. VI, § 7).
***448 The Constitution of 1894 was the first to use divergent nomenclature to describe the remuneration of state officeholders. Under a heading of "Compensation," members of the legislature were entitled to a "salary" of $1,500 per year plus reimbursement of travel expenses at a defined rate of $1 for each 10 miles (see 1894 N.Y. Const., art. III, § 6). Under another heading also titled "compensation," the Governor was entitled to a "salary" of $10,000 per year plus a furnished residence (see 1894 N.Y. Const., art. IV, § 4). A separate paragraph regarding the lieutenant governor was titled "Salary," which was set at the sum of $5,000, but as to that officeholder, the text prohibited receipt of "any other compensation, fee or perquisite" for the performance of state duties (see 1894 Const., art. IV, § 8). Whereas legislators and the executives were each expressly entitled to "salaries," judges and justices were instead entitled to "compensation," without elaboration, and with the only reference to their "salary" being that such money be financed for the county and surrogate courts by the counties in which they sat (see 1894 N.Y. Const., art. VI, §§ 12, 15). The 1894 Constitution provided a guarantee that judicial compensation not be diminished during any term of office (see 1894 N.Y. Const., art. VI, § 12).
A 1925 amendment to the 1894 Constitution continued the word "compensation" to describe judicial remuneration, and continued *828 **29 the guarantee that compensation not be diminished during terms in office (see N.Y. Organization of St. Jud. System, Amend. 4 [1925] ).
The 1938 Constitution continued the header of "Compensation" for the state legislators, the Governor, and for the first time the Lieutenant Governor. It was specifically defined for those officeholders within the definitional texts as "salary" and travel expenses for legislators, "salary" and a residence for the governor, and straight "salary" for the lieutenant governor (see 1938 N.Y. Const., art. III, § 6; art. IV, §§ 3, 6). However, the judiciary article continued to scrupulously avoid use of the word "salary," and instead referred only to "compensation" that was to be paid without diminishment to the remainder of the judicial terms (see 1938 N.Y. Const., art. VI, § 19). The same language was unmolested by a 1961 constitutional amendment that reorganized the courts of the State, and represents the language that is still controlling today (see 1962 Laws of N.Y. at 4025; 1961 Laws of N.Y. at 2708-2734).
A review of the various Constitutions and amendments establishes that since 1894, legislative and executive remuneration ***449 has been expressed as including "salary" and, where applicable, certain defined perquisites and benefits. In contrast, judicial remuneration has been expressed solely and strictly as "compensation." The specific language of the Compensation Clause today provides that the "compensation" of state judges and justices "shall be established by law and shall not be diminished during the term of office for which he or she was elected or appointed" (N.Y. Const., art. VI, § 25[a] ).
The 1894 Constitution is the document that is of the most historical importance to this matter as it reflects the first instance when the drafters of the New York Constitutions expressly differentiated between the "salary" and other benefits payable to legislators and executives, and the "compensation" payable to members of the judiciary. There appear to be no available original or secondary source materials that explain the difference in terminology. The reason for differentiating between salary and compensation in 1894 is not disclosed in the Journal of the Constitutional Convention of the State of New York (1894), the Report of the Debate and Proceeding of the Convention, or in the Documents of the Convention volumes 1-2 (see New York State Library, Documents from the 1894 N.Y. Constitutional Convention). Not even Charles Z. Lincoln's The Constitutional History of New York,[2] which is perhaps the most authoritative study of the State's early constitutional history, provides any explanation or insight into the contrasting terminology. Cases decided prior to 1894 on matters involving judicial compensation, such as People ex rel. Bockes v. Wemple, 115 N.Y. 302, 22 N.E. 272 (1889), Gilbert v. Board of Supervisors of County of Kings, 136 N.Y. 180, 32 N.E. 554 (1892), and People ex rel. Follett v. Fitch, 145 N.Y. 261, 39 N.E. 972 (1895) (interpreting a pre-1894 statute), are of limited value as they predate the significant language changes adopted in the Constitution of 1894. Yet, there can be no question that for the last 123 years, the distinction between "salary" and "compensation" has conspicuously existed in the New York Constitution. Absent convention debate or reports reflecting the specific intent of the drafters on this issue, our *829 **30 interpretation of the meaning of such nomenclature must necessarily rest upon the words themselves and their common usage (see Anderson v. Regan, 53 N.Y.2d 356, 362, 442 N.Y.S.2d 404, 425 N.E.2d 792 [1981] ; Matter of Rahill v. Bronstein, 32 N.Y.2d 417, 420-421, 345 N.Y.S.2d 534, 298 N.E.2d 674 [1973] ; People v. Carroll, 3 N.Y.2d 686, 689, 171 N.Y.S.2d 812, 148 N.E.2d 875 [1958] ). ***450 Words matter. "Salary" and "compensation," while related, are not one and the same. Tellingly, the Constitution of 1894 referred to legislative and gubernatorial "Compensation" as a mere title header to the description and obligations of those branches of state government (see 1894 N.Y. Const., art. III, § 6; art. IV, § 4). The texts within the legislative and executive articles of the 1894 Constitution, underneath their headers, then defined those officeholders' remuneration as "salary" and in the specific case of the legislators and Governor, reimbursements and perquisites. The straight $5,000 "salary" of the lieutenant governor was plainly described as such in the absence of other perquisites or benefits, and without reference to any complicating reference to payable compensation (see 1894 N.Y. Const., art. IV, § 8). Clearly the Constitution of 1894 employed the word "compensation" as a broad umbrella term, and used the word "salary" as one component thereof, perhaps the largest, fitting under the compensation umbrella. Therefore, where article VI, § 12 of that Constitution described judicial remuneration solely in terms of "compensation" without any reference to "salary," the drafters purposely chose to cloak the judiciary under that umbrella, without limiting judicial remuneration to any narrower term or definition. The reason for doing so might be self-evident and central to this appeal; namely, that only remuneration for the judicial branch of government was described in the same sentence as subject to non-diminution during any terms of judicial office (see 1894 N.Y. Const., art. VI, § 12).[3] By implication and reasonable construction, the drafters of the Constitution of 1894 were seeking to provide members of the judiciary with broad protections, such that the non-diminution of compensation be expansive and extend to all forms of emoluments that judges and justices could traditionally expect to receive at that time.
For these reasons, the linguistic differential between legislators' and executives' "salaries," perquisites and benefits, as distinguished from jurists' "compensation," from 1894 forward, demonstrates that salary and compensation are not synonymous terms.
***451 II.
State-sponsored health care coverage was not specifically mentioned in the Constitution of 1894 or its 1938 successor. The issue has "called into life a being the development of which could not have been foreseen completely by the most gifted of [constitutional] begetters" (see Missouri v. Holland, 252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641 [1920] ). Litigation over the meaning of judicial "compensation" has been sparse. Three cases from the late 1800s that appear instructive on their faces address issues of judicial compensation: People ex rel. Bockes v. Wemple, 115 N.Y. 302, 22 N.E. 272 (1889), Gilbert v. Board of Supervisors of County of Kings, 136 N.Y. 180, 32 N.E. 554 (1892), and *830 **31 People ex rel. Follett v. Fitch, 145 N.Y. 261, 39 N.E. 972 (1895). However each of these reported cases involve constitutional analysis, or in the case of Follett, a statute, that became outdated with the subsequent adoption of the Constitution of 1894 containing the distinction between "salary" and "compensation." Nevertheless, to the extent arguably relevant, Bockes, while dusty, actually supports the conclusion that the Compensation Clause is intended to protect more than mere salary.
In 1889, this Court faced the question of whether judicial compensation was limited to a $6,000 annual payment, or included an additional $1,200 annual payment authorized in lieu of job-related expense reimbursements (see People ex rel. Bockes v. Wemple, 115 N.Y. at 306, 22 N.E. 272 ). At that time, Justices of the Supreme Court were entitled to compensation to the end of their elected terms in office, even if a term ended after a justice reached the mandatory retirement age of 70. The legal questions posed were twofold: (1) whether the Justice's post-retirement compensation was to be paid at the rate of $6,000 per year or $7,200 per year, and (2) whether a payment of only $6,000 represented a diminution otherwise prohibited by the then-existing Constitution. This Court held that the $7,200 total amount that had been paid to the justice prior to retirement remained intact, and a continuing debt of the State, until the expiration of the official term in office to which that justice had been elected (see People ex rel. Bockes v. Wemple, 115 N.Y. at 311, 22 N.E. 272 ). The Court described the $1,200 payment "as much a part of the compensation to the justice as though his salary, eo nomine, had been increased to compensate him further for what his office entailed upon him in the way of duties and work" ( People ex rel. Bockes v. Wemple, 115 N.Y. at 309-310, 22 N.E. 272 ). In other words, the precedent establishes that the Compensation Clause is not limited to the mere and strict "salary" that is ***452 scheduled and adjusted from time to time by the legislature, but more broadly includes, at least in the instance of Bockes, the "in lieu of" payment that substituted for the reimbursement of itemized job-related expenses.[4]
Here, the majority maintains that Bockes limits judicial compensation only to remuneration that is directly related to the performance of official duties and work. In fact, Bockes did not address *831 **32 whether other forms of remuneration or benefits, which did not exist until decades later, could equally qualify as compensation. Today, almost 13 decades after this Court decided Bockes, judicial compensation bears little resemblance to its nineteenth century predecessor. Indeed, judicial compensation is complicated by a wide array of permutations including tax-advantaged 401(k) plans, flex spending medical and childcare accounts, deferred compensation options, the reimbursement of itemized job-related expenses, pension contributions and accounts, and as solely relevant here, state-sponsored health care coverage paid for mostly by the State and partially by the participating members of the judiciary.
III.
Turning attention more specifically to health care insurance contributions, authority is scant in New York and throughout the nation as to whether states' contributions toward the ***453 expense is protected by judicial Compensation Clauses. In New Jersey, where the Compensation Clause prohibits the diminution of judicial "salaries" during the terms of judicial appointment (see N.J. Const., art. VI, § 6, para. 6), the New Jersey Supreme Court held under facts similar to those present here that an increase in jurists' percentage contributions toward health care premiums, and toward pensions for that matter, was unconstitutional (see DePascale v. State, 211 N.J. 40, 62, 47 A.3d 690, 703-704 [2012] ; accord Hudson v. Johnstone, 660 P.2d 1180, 1182 [Alaska 1983] [unconstitutionality of Alaska's increase in judges' paycheck deduction toward the state's retirement system]; Stiftel v. Carper, 378 A.2d 124, 132 [Del.Ch. 1977], affd. 384 A.2d 2 [Del.1977] [same, as to Delaware] ). In contrast, the Court of Appeals of Michigan has held that a city's elimination of payments for judges' health care coverage and lesser fringe benefits did not violate that state's statutory judicial compensation protections (see Garian v. City of Highland Park, 176 Mich.App. 379, 382, 439 N.W.2d 368, 369-370 [1989] ). Michigan's non-diminution statute is similar to New Jersey's Compensation Clause in that its guarantees are directed at judicial "salaries," and not at "compensation" (see Mich. Comp. Laws § 600.8202 [5] ).
New York's Compensation Clause, unlike the language employed in New Jersey and Michigan, is not protective of "salaries," which is a narrow and targeted term, but of "compensation," which is broader and more inclusive. This Court used the terms "pay," "salary," and "compensation" interchangeably in Bockes, Gilbert, and/or Follett, but in those cases, it was not called upon to define any distinctions between the nomenclature, because doing so would have made no difference to the narrow decisions the Court was called upon in those instances to render.
The interpretation of the "compensation" terminology used in the New York Constitution arose in a 2009 Appellate Division decision addressing the question of whether the elimination of paid health care benefits to a village justice during his term in office violated the State's Compensation Clause. While not binding here, the Second Department held that the mid-term elimination of the justice's paid health benefits was an encroachment on the compensation protections afforded by article VI, § 25(a) of the New York Constitution (see Roe v. Board of Trustees of Vil. of Bellport, 65 A.D.3d 1211, 1212, 886 N.Y.S.2d 707 [2009] ). During the same year, the First Department viewed ***454 judicial "compensation [as] consisting of the pay scale and benefits " ( Larabee v. Governor of State of N.Y., 65 A.D.3d 74, 85, 880 N.Y.S.2d 256 [2009] [emphasis added], affd. as mod. *832 **33 14 N.Y.3d 230, 899 N.Y.S.2d 97, 925 N.E.2d 899 [2010], rearg. dismissed 16 N.Y.3d 736, 917 N.Y.S.2d 101, 942 N.E.2d 311 [2011] ).
Interestingly, the record evidences that New York State employees may opt out of the health care coverage offered by the State, and receive in exchange an "incentive payment" that is pro-rated in biweekly paychecks as taxable income (record at R89, R109, R117). If incentive payments are treated by the federal government as taxable income, the State's contributions toward the cost of the health care insurance coverage that is not waived by other employees should be construed as compensation as well.
Health care insurance coverage has been defined as part of compensation, outside the scope of the Compensation Clause, in a variety of decisions from the Second, Third, and Fourth Departments, and in state and federal statutes. The appellate decisions include, from the Fourth Department, Matter of Board of Educ. of Dundee Cent. School Dist. (Coleman), 96 A.D.3d 1536, 1539, 947 N.Y.S.2d 707 (2012) ("a contribution toward an employee's health insurance is a form of compensation") . The Third Department has separately opined that "[i]t is generally undisputed that health insurance benefits are a form of compensation 'encompassed within the definition of terms and conditions of employment' " ( Matter of Police Assn. of City of Mount Vernon v. New York State Pub. Empl. Relations Bd., 126 A.D.2d 824, 825, 510 N.Y.S.2d 742 [1987], quoting Matter of Town of Haverstraw v. Newman, 75 A.D.2d 874, 874-875, 427 N.Y.S.2d 880 [1980] ). Indeed, in Matter of Town of Haverstraw, the Second Department declared that "[t]here is no reason to distinguish legal insurance from health insurance or group life insurance. All are a form of compensation and, as such, are encompassed within the definition of terms and conditions of employment" ( id. at 874-875, 427 N.Y.S.2d 880 ).
Likewise, Judiciary Law § 34, which apportions the cost of judicial remuneration between the State and counties, defines compensation as including "the employer's share of the premium for the coverage ... under the health insurance plan created by article eleven of the civil service law." Under Tax Law § 24-a (b)(3), a " '[q]ualified production expenditure' means ... all salaries, wages, fees, and other compensation including related benefits." A "living wage" under Administrative Code of the City of New York § 6-134(b)(9) is defined as
***455 "an hourly compensation package that is no less than the sum of the living wage rate and the health benefits supplement rate for each hour worked ... The portion of the hourly compensation package consisting of the health benefits supplement rate may be provided in the form of cash wages, health benefits or any combination of the two."
Under a federal statute, the Board of the Tennessee Valley Authority must "approve all compensation (including salary or any other pay, bonuses, benefits, incentives, and any other form of remuneration) of all managers and technical personnel that report directly to the chief executive officer" ( 16 U.S.C. § 831a [g][1][G] ). In another federal statute, the Senior Executive Service of the United States "shall be administered so as to ... (1) provide for a compensation system, including salaries, benefits, and incentives, and for other conditions of employment, designed to attract and retain highly competent senior executives" ( 5 U.S.C. § 3131 ). Title 5 of the United States Code, which sets forth federal employees' compensation rights, "govern [s] all incidents of employee compensation, including basic salaries; salary increases;
*833 **34 overtime, holiday and sick pay; life and health insurance benefits; retirement benefits; travel and subsistence allowances; and compensation for injury and unemployment" ( Kizas v. Webster, 707 F.2d 524, 536 [D.C.Cir.1983] ).
The State's contributions toward the health care insurance premiums of judges and justices are not quantified in the record in actual dollars, but as percentages of the total costs only. The State's contributions are likely the single largest emolument that the participating members of the judiciary receive beyond scheduled salaries themselves. While the State's health care contribution may not approach, in relation to salary, the $6,000:$1,200 ratio that this Court protected as additional compensation in Bockes, it is undeniably significant given the high costs of health care premiums today. We need not concern ourselves about whether the definition of compensation may or may not impact negligible issues such as parking privileges or cafeteria discounts. Only the State's contributions toward health care insurance premiums are at issue here, the significance of which cannot reasonably be compared to the lesser job-related perquisites which are outside the scope of this appeal.
Notably, the precursors to the current New York Constitution broadly defined judicial remuneration as compensation rather than as salary, at a time when employer-provided health care ***456 insurance did not exist. What did exist, as discussed in Bockes, were job-related out-of-pocket expenses that were initially reimbursed by the State on an itemized basis, then covered by an annual $1,200 "in lieu of" payment, and which later reverted to the itemized reimbursement practice that is in effect today. Clearly, there has always been an understanding, expectation, and practice that in one form or another, judicial compensation included reimbursements for expenses incurred on the job, even though no such entitlement is specifically referenced in any state constitution or amendment thereto. Now, nearly two decades into the twenty-first century, the burgeoning cost of health care is undisputed. The State now routinely offers employees health care policies and routinely makes contributions toward their costs, reflecting a new and additional understanding, expectation and practice. These contributions, whether 90%, 88% or 84%, are significant for the employees who receive them and the employer who pays them, in both percentage and actual dollar terms.
When attorneys in private practice or employed in other capacities consider whether to seek a full-time judgeship by appointment or election, a prime consideration for many is the financial affordability of the career change. In some instances, the new jurist will incur a reduction in annual compensation by choosing a career on the bench. Similarly, current full-time judges and justices in New York assess their financial situations when deciding whether to seek reappointment or reelection, or to choose higher remuneration in the private sector. Still other members of the judiciary consider when and whether to retire from the bench, with or without the intention of remaining in the legal profession in some other form or fashion, and will factor into their calculation the financial impact of the decision. Prospective, current, or retiring jurists examining the financial ramifications of these career decisions will logically and necessarily consider the total compensation package they would expect to receive during a term in office or in retirement. Health care expenses for the jurist, and for covered dependents in many instances, are a significant sum of money as they are to employees in any profession, and constitute an integral part of the calculation *834 **35 which must be made in deciding the affordability of entering, remaining in, or retiring from public service in the judiciary.
In sum, the State's contribution toward the health care insurance premiums of the participating members of the judiciary ***457 should be acknowledged as part of compensation within the protective cocoon of the Compensation Clause because, for reasons noted, doing so gives "practical effect" to the terms and wording of the Compensation Clause (see Ginsberg v. Purcell, 51 N.Y.2d at 276, 434 N.Y.S.2d 147, 414 N.E.2d 648 ). It is a significant element of judicial remuneration and has been treated as such, as a practical matter, by both employer and employees, and in statutes and cases, no less so than the annual $1,200 "in lieu of" allowance that was protected by Bockes.
IV.
The judgment appealed from should nevertheless be reversed.
Any direct reduction of compensation to members of the state judiciary violates New York Constitution, article VI, § 25(a) (see Matter of Maron v. Silver, 14 N.Y.3d 230, 252-254, 899 N.Y.S.2d 97, 925 N.E.2d 899 [2010] ). At first blush, the State's reductions in health care insurance contributions embodied in Civil Service Law § 167(8) would appear to be violative of the Constitution and warrant judgment in plaintiffs' favor.
However, legislative enactments, such as Civil Service Law § 167(8), are presumed to be constitutional, and those who challenge them "bear a heavy burden of proving unconstitutionality beyond a reasonable doubt" ( City of New York v. State of New York, 76 N.Y.2d 479, 485, 561 N.Y.S.2d 154, 562 N.E.2d 118 [1990] ; see Elmwood-Utica Houses v. Buffalo Sewer Auth., 65 N.Y.2d 489, 495, 492 N.Y.S.2d 931, 482 N.E.2d 549 [1985] ). On this record, plaintiffs have failed to satisfy their burden that the reduction in the State's percentage contributions toward health care insurance premiums-from 90% to 84% for active jurists and from 90% to 88% for retirees-represents any net reduction of the value of the benefit to current and former members of the judicial branch. Plaintiffs' claim is not that the State is paying less money per jurist overall, or less than it previously did for health care insurance premiums at the expense of individual members or retirees of the judiciary. Rather, plaintiffs' claim is only that the State now contributes a lower percentage of those premiums. The record is silent on whether the actual costs to the State have increased or decreased. If, for instance, the State's contributions toward health care insurance premiums increase in a relevant year by a dollar amount that exceeds the value of the State's 6% reduction in contributions for jurists or the 2% reduction for retirees, the judiciary, rather than suffering a diminution of overall compensation, may arguably come ***458 out "ahead" in the equation. In other words, the 6% or 2% contribution reductions toward premiums, as authorized by Civil Service Law § 167(8), do not necessarily and mathematically reduce the value of the insurance payments provided by the State, like a see-saw, without additional evidence that insurance payments by the State have not independently risen by 6% or 2% or more, if at all. Absent a mathematical showing by plaintiffs that the State's health care contributions, protected by the Compensation Clause, have been reduced in dollar terms for the insurance products provided, rather than in percentage terms, plaintiffs fail, as constrained by their allegations, to satisfy their burden of proof.
The record evidence also fails to address qualitative differences that may exist in *835 **36 state-sponsored health care insurance coverage from year to year. If, for instance, current or former members of the judiciary pay an additional percentage for their coverage, but the quality of that coverage improves by some measurement by the same or greater percentage, it cannot be said that their compensation has been diminished, because the additional expenditure merely purchases an improved health care product to the same degree. This Court does not know whether the percentage reduction in the State's contributions has been accompanied by any increase or decrease in the quality of coverage, because plaintiffs have failed to address their burden of proof on the issue.
The foregoing is consistent with Maron v. Silver, 14 N.Y.3d at 254, 899 N.Y.S.2d 97, 925 N.E.2d 899, wherein we held that the Compensation Clause is not violated if inflation erodes the value of compensation. Absent a showing that the State's health care contributions have lessened because of the 6% or 2% reductions at issue here, or proof that the substance of the insurance has meaningfully decreased, plaintiffs fail to meet their burden of overcoming the presumption of constitutionality that is attached to Civil Service Law § 167(8).
By concluding that a direct diminution of judicial salary has not been mathematically established, in dollar terms, we do not reach the secondary question of whether the State's reduced percentage contributions toward health care premiums for the judiciary and its retirees was accomplished in a discriminatory or nondiscriminatory manner as compared with other employees of the State (see United States v. Hatter, 532 U.S. 557, 571, 121 S.Ct. 1782, 149 L.Ed.2d 820 [2001] ).
***459 Accordingly, the judgment should be reversed without prejudice to plaintiffs recommencing a new action, if they be so advised.

The 1821 Constitution is sometimes also referred to in literature as the Constitution of 1822, the year of its effective date.

Charles Z. Lincoln, The Constitutional History of New York, vols. I-V (Lawyers Co-operative Publishing Company 1905-1906).

The Constitution of 1821 had protected the Governor's compensation from diminishment during any term in office (see 1821 N.Y. Const., art. III, § 4), but that provision was dropped in subsequent Constitutions.

Bockes was not without its limits. The Board of Supervisors for Kings County voluntarily paid the justices in that county an additional $6,000 annual allowance for drawing local jurors. This Court held in 1892 that the reference in the Compensation Clause to "compensation to be established by law" did not extend to additional allowances that municipalities might, in their discretion, add to remuneration for special local services (see Gilbert v. Board of Supervisors of Kings County, 136 N.Y. at 185-186, 32 N.E. 554 ). The Court's reasoning reached a result that was both practical and consistent with the State's constitutional obligations (id. at 186, 32 N.E. 554 ). Judicial compensation extending beyond the jurists' age-related retirement was enough of a hot-button issue in the 1890s that it prompted an amendment to the Constitution in 1894. The 1894 amendment eliminated the post-retirement payment of compensation for jurists elected after January 1, 1894 (see 1894 N.Y. Const., art. VI, § 12). Similarly, in People ex rel. Follett v. Fitch, 145 N.Y. 261, 39 N.E. 972 (1895), this Court addressed the constitutionality of 1882 legislation that required payment by the City of New York of up to $500 per year for Supreme Court Justices residing outside the city but assigned to a General Term within the city, as reimbursement for expenses and disbursements (L. 1882, ch. 410, § 1109, as amended L. 1883, ch. 104). This additional sum was held to be not guaranteed and not subject to the Compensation Clause, as job-related expenses and disbursements were already subsumed by the then-existing $1,200 annual payments made by the State in lieu of itemized expenses (see People ex rel. Follett v. Fitch, 145 N.Y. at 266, 39 N.E. 972 ).